Gira H. **PATEL,** Plaintiff–Appellant,

v.

**ALLSTATE INSURANCE COMPANY,** Defendant–Appellee.

No. 96–1028.

United States Court of Appeals, Seventh Circuit.

Argued May 20, 1996.

Decided Jan. 28, 1997.

---

Thomas C. Crooks (argued), Tobin & Associates, Chicago, IL, for Plaintiff–Appellant.

Gloria M. Portela, Joseph S. Turner (argued), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendant–Appellee.

Before CUDAHY, COFFEY, and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

Gira H. Patel sued her former employer, Allstate Insurance Company, claiming that Allstate had discriminated against her in the terms and conditions of her employment and had discharged her on the basis of her national origin (Indian). Patel alleged that, after allowing her to transfer within the company from the position of a microfiche clerk to that of a cash processor, Allstate failed to provide her with the training necessary to succeed as a cash processor, training which she claims Allstate provided to non-Indian cash processors. Patel also alleged that her supervisor subjected her to other forms of disparate treatment. The district court

granted Allstate's motion for summary judgment. We affirm.

## I. BACKGROUND

From the parties' submissions, it is clear that they disagree on certain facts and the reasonable inferences to be drawn from them. Of course, in this appeal from the entry of summary judgment, we must view the facts in the light most favorable to the non-moving party, Patel. In addition, we must draw all reasonable inferences from those facts in Patel's favor. *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir.1996). In doing so, however, we must consider the entire record. *Id.; Powers v. Dole*, 782 F.2d 689, 694 (7th Cir.1986). Accordingly, we will not ignore facts in the record merely because they are unfavorable to Patel; Patel gets the benefit of the doubt only if the record contains competent evidence on both sides of a factual question.

Patel was born in India in 1951. She came to the United States in September 1978 having previously acquired a bachelors degree in economics and statistics, as well as degrees in banking and accounting. She worked for five years for Crum & Foster Insurance as a "rater" (commercial analyst) and was advanced to an "underwriter assistant" position.

Patel stopped working for a year to care for her young child and thereafter was employed by Allstate in 1984 as a "Commercial Analyst A." One year later, she was promoted to "Commercial Analyst B." As a commercial analyst, Patel determined rates for automobile insurance policies. Patel worked as a commercial analyst for three years and then went on maternity leave. After eleven months on maternity leave, her supervisor called her and asked her to return to Allstate in order to work on a six-month project doing work in preparation for computerizing auto rating. When the six-month project was completed, Patel's supervisor asked her to return to her job as a commercial analyst, which she did.

Patel continued her work as a commercial analyst until approximately October 1989. At that time, Patel sought a transfer to the second shift due to child care issues. She was offered and accepted a clerical position in the microfiche department. Sometime thereafter, the microfiche department discontinued its second shift operation and Patel was transferred to the first shift. Subsequently, Patel's supervisor advised employees on the first shift to apply for other positions within Allstate because the microfiche department was being phased out entirely.

Patel applied for a position as a cash processor (with the title, Senior Accounting Assistant) in the accounting department of Allstate's Reinsurance Division. Ildiko Schultz, the Accounting Division Manager, interviewed Patel, as did Tammy Hood and Kathy Kraft, both of whom were accounting unit supervisors under Schultz. Based on Patel's background and employment interview, Schultz concluded that Patel had the intellectual ability to perform the job of a cash processor, though she was not sure she would have hired Patel if Patel had not been previously employed by Allstate. Kraft told Schultz that she felt Patel "could fit right into the accounting department." Because Patel was a current employee and was qualified for the position of cash processor, Kraft and Schultz had no other choice under company policy but to accept Patel as a transfer into the position of cash processor.

Patel was transferred to Kraft's unit on January 17, 1993. Kraft's unit consisted of approximately four cash processors and five account processors. One of the other cash processors in Kraft's unit at the time, Parul Shah, was from India. Shah has stated in her deposition testimony that she had no disagreements with Kraft and "always had a good relationship with her."[1] Shah

---

1. The plaintiff takes issue with Shah's claim that she had a good relationship with Kraft, asserting that she once overheard Shah and Kraft quarrelling. Specifically, Patel says that she heard Shah complain to Kraft that she was being given the more difficult accounts and that the easy accounts were going to other cash processors. Patel's testimony that she overheard Shah and Kraft quarrelling might be admissible for the limited purpose of establishing that Shah and Kraft did not always agree or get along (which, by itself, hardly supports Patel's claim of discrim-

left Kraft's unit voluntarily in November 1993 for child care reasons.

Allstate's Reinsurance Division provides reinsurance to other insurance companies. The cash processors in the accounting department of the Reinsurance Division are responsible for collecting balances or making payments to brokers or insurance companies, reconciling Allstate's records with the records of the brokers and resolving discrepancies (i.e., making sure both sets of records match), applying cash receipts, and inputting terms of insurance policies negotiated by underwriters into the department's mainframe computer system (the "ARES" system). The cash processors are also responsible for preparing a monthly status report on their assigned accounts and for completing follow-up reports on open items.

Collections are accomplished largely through telephone contacts between the cash processors and customers. Cash processors also communicate with customers through faxes and short letters. In 1993, these letters and faxes could be prepared by the cash processor by using either "WordPerfect" software on a personal computer or a conventional typewriter, although it was less efficient to use the typewriter. Two other employees, one cash processor and one account processor, used the typewriter to prepare correspondence because they were more comfortable with a typewriter than a personal computer.

New cash processors are given training that generally consists of two to four months of formalized classroom training and one month of on-the-job training (also called "production training"). Training may be extended if a particular employee needs additional attention. Prior to becoming a supervisor, Kraft developed the training program for cash processors, which included an indepth procedure manual.

Patel began the training program for cash processors upon her transfer into the accounting department. The training program consisted of formal classroom training and individual one-on-one training. In Patel's case, she was the only cash processor in the training program at that time. The other employees in her unit were experienced cash or account processors.

Starting January 20, 1993, Gloria Nikides, the department trainer, instructed Patel in a wide variety of topics and functions related to the cash processor job. Nikides spent about six to seven hours per day with Patel. Part of this time (approximately two hours per day, two to three days per week) was spent in formal classroom training. Patel was instructed to direct all questions related to training to Nikides prior to asking any other employee. Furthermore, she was instructed to consult her manual before asking anyone questions.

Patel's training included one session devoted to "Supercalc," a computer software program. Training in Supercalc was not a normal part of the training program because Supercalc was being used merely as a short-term fix in preparing TPAA reports (monthly balance statements sent to the cash processors' accounts). Nikides was told to provide sufficient training to Patel in Supercalc to enable her to prepare a TPAA. According to Patel, the one to two hours of Supercalc training she received was insufficient to enable her to prepare a TPAA.

Patel also received limited training in how to use "Dataease," a software program which contained a form used to update follow-up activities on preposted and unallocated items. Her training in Dataease was limited to what was necessary to perform the follow-up updates utilizing that particular Dataease form.

Approximately four to five weeks into Patel's training, Nikides told Kraft that Patel could not type. She also reported that Patel had no familiarity with a computer terminal keyboard, though Patel had in fact previously worked on one at Allstate. Patel admits she

---

ination). However, the substance of the alleged conversation between Shah and Kraft (what they were allegedly arguing about) would clearly be inadmissible as hearsay evidence, i.e., an out-of-court statement "offered in evidence to prove the truth of the matter asserted." Fed.R.Evid.

801(c). It is well established that "a party may not rely upon inadmissible hearsay in an affidavit or deposition to oppose a motion for summary judgment." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir.1996).

did not know how to type and that she would not have taken the position if she had known that typing was required. Although the ability to type is not a requirement of the cash-processor job per se or a core competency, basic typing such as preparing short letters and faxes is very helpful in carrying out the duties of a cash processor.

Kraft took the responsibility for improving Patel's typing skills, leaving Nikides to concentrate on training Patel in the core competencies of the position. Kraft contacted the training department at Allstate and inquired about available resources to teach the plaintiff to type. Ultimately, Kraft identified a self-directed, personal computer based tutorial program available at Allstate for Patel. Kraft suggested to Patel that she practice typing each day with the tutorial program and e-mail the results to Kraft. Patel practiced with the tutorial program every work day, unless the room was being used for other purposes and was not available to her. She always communicated her results to Kraft.

Kraft told Patel that she wanted to enroll Patel in an "Introduction to WordPerfect" class by the third quarter of 1993. Based on her experience from having taken this class, Kraft believed that Patel needed a certain level of familiarity with a computer keyboard to keep up with and benefit from the Word-Perfect class. Kraft consulted a WordPerfect instructor at Allstate, Karen Dehmlow, to further determine what skills a person needed to get the most out of the WordPerfect class. Kraft did not refer specifically to Patel or Patel's situation in her discussion with Dehmlow. According to Kraft, Dehmlow told her that if someone doesn't have typing skills either they are left behind in the

WordPerfect class or they might even hold back the progress of the rest of the class. Dehmlow, who at her deposition did not recall Kraft's inquiry, takes it for granted that employees have a certain level of typing speed prior to taking the WordPerfect course. Nevertheless, according to Dehmlow, even a poor typist can benefit from WordPerfect training, though there is no evidence that she conveyed this belief to Kraft.[2] Based on her own experiences with Word-Perfect and her discussion with Dehmlow, Kraft determined that achieving a typing speed of 30 words per minute was a good goal for Patel to achieve prior to taking the WordPerfect class.

By April 6, 1993, Patel had completed all of the formal classroom training. In May, Patel commenced her production-in-training period. Because of problems that surfaced during that period, her production-in-training period was extended one month. On or about June 22, 1993, Kraft prepared a performance evaluation (a "Progress Development Summary" or "PDS" in Allstate lingo) for Patel because Kraft determined that Patel's performance was not meeting the required level. The PDS listed ten goals that Patel was supposed to attain by the end of July. In written comments at the end of the PDS, Patel objected to many of the criticisms leveled at her. She did not attribute any of her problems to a lack of training in WordPerfect, Supercalc, Dataease, or business writing.

In July and August, Kraft prepared follow-up performance evaluations in review of Patel's progress in meeting the goals outlined in the first PDS. According to these evaluations, Patel continued experiencing problems in the areas noted in the first PDS.[3] These

---

**2.** According to Kraft, Dehmlow recommended a typing speed of 25 words per minute before a person be allowed to take the WordPerfect course. However, Dehmlow testified in her deposition that, while it would be "nice" if a person could type well, a certain typing speed is not absolutely required in order for a person to benefit from WordPerfect training. Thus, we must accept this view as it is more favorable to Patel. On the other hand, we do not believe it is reasonable to infer from this (as Patel would have us do) that Kraft fabricated the conversation she claims to have had with Dehmlow. There is no evidence of fabrication. On the contrary, Kraft's

account of her conversation with Dehmlow agrees in general with the views Dehmlow expressed in her deposition testimony. *See infra.*

**3.** The deficiencies noted in these evaluations included: failure to complete an adequate status report, failure to adhere to follow-up procedures for preposted and unallocated cash items and 90–day past due accounts, failure to reconcile accounts of all assigned brokers and prepare TPAA collection statements in a timely manner, committing errors in processing cash receipts and disbursements, committing errors inputting

negative evaluations resulted in Patel being placed on "job-in-jeopardy" status. In August and September, Patel again received evaluations to track her performance. The evaluations noted that Patel continued to fail to meet the requirements of the cash processor position. On September 15, 1993, Patel was discharged from her position at Allstate.

On December 23, 1994, Patel filed suit against Allstate. She claimed that Allstate subjected her to discrimination in the terms and conditions of her employment and terminated her because of her national origin. Specifically, Patel alleged that she was denied computer training because she could not type 30 words per minute, whereas American-born employees received the computer training that Patel was denied even though the American-born employees were also unable to type 30 words per minute. In addition, she made a general allegation that Allstate had subjected her to "other disparate treatment," though she failed to identify any specific instances of such treatment. Patel alleged that the refusal to provide her with necessary training and the other disparate treatment to which she was subjected resulted in her being unable to perform satisfactorily in her position.

On September 6, 1995, Allstate moved for summary judgment. Allstate initially noted that there was no direct evidence of discrimination against Patel. According to Allstate, Patel had failed to establish a prima facie case of national origin discrimination because there was no evidence presented establishing that similarly situated American-born employees received better training than Patel. The district court agreed with Allstate's argument and granted Allstate's motion for summary judgment. Patel filed an appeal.

## II. ANALYSIS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A "genuine" issue of fact is one on which a reasonable factfinder could find for the nonmoving party. An issue of fact is "material" if it is outcome determinative. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Once the moving party identifies the absence of a genuine issue of material fact on a particular issue, the nonmoving party may not rest on the pleadings; rather, the nonmoving party must demonstrate with specific evidence—evidence based on personal knowledge—that there is a genuine issue of material fact that requires a trial. Fed. R. Civ.P. 56(e); *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir.1995) (hearsay testimony may not be considered in summary judgment proceeding); *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir.1989).

Title VII of the Civil Rights Act of 1964 makes it an unlawful employment practice

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a)(1).[4] Thus, to prevail in an employment discrimination case under Title VII, the plaintiff must prove by a preponderance of the evidence that the employer made an adverse employment decision with respect to him because of race, color, religion, sex, or national origin. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 514, 113 S.Ct. 2742, 2751, 125 L.Ed.2d 407 (1993) (noting that the law requires a "finding that the employer's action was the product of unlawful discrimination").

policy registers, and failure to adhere to due dates.

**4.** Title VII specifically prohibits discrimination "in admission to ... any program established to provide apprenticeship or other training." 42 U.S.C. § 2000e–2(d). However, in their argu-

ments to the district court on Allstate's motion for summary judgment, the parties apparently assumed that the general provision in § 2000e–2(a) prohibiting discrimination with respect to terms and conditions of employment applies.

Patel does not contend that there is any direct evidence of unlawful discrimination. Instead, she attempts to demonstrate the existence of a genuine issue of material fact through the indirect, burden-shifting method of establishing the elements of discrimination as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the *McDonnell Douglas* schema, a plaintiff must initially establish a prima facie case of discrimination. When the plaintiff succeeds in establishing a prima facie case, this raises a rebuttable presumption that the employer discriminated against the employee. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). At this point, the burden shifts to the defendant to produce a legitimate, nondiscriminatory explanation for the adverse employment decision to rebut the plaintiff's prima facie case. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. Once the defendant discharges its burden of producing a legitimate explanation, the presumption drops from the case, and the plaintiff has the opportunity to demonstrate that the employer's explanation is pretextual. The plaintiff retains the ultimate burden of persuading the trier of fact that the actual reason for the adverse employment decision was intentional discrimination. *Hicks*, 509 U.S. at 507–08, 113 S.Ct. at 2747–48.

### A. Discriminatory Training

Patel's primary claim is that Kraft discriminated against her by refusing to allow Patel to take classes in three computer software programs and in business writing. The parties agree that in order to make out a prima facie case on this claim Patel would have to demonstrate, among other things, that the training she sought was not provided under circumstances giving rise to an inference of

discrimination. *See Lopez v. Metropolitan Life Ins. Co.*, 930 F.2d 157 (2d Cir.1991).[5] Patel claims that she can satisfy this requirement through evidence that Kraft harassed her, lied about the reasons for not providing the training, and assigned her unusually difficult and complex work. Allstate maintains that Patel would have to demonstrate that other, non-Indian employees, who like Patel lacked the ability to type, were given the training that Patel was denied. Patel objects to any such requirement, however, contending that it penalizes her unfairly because Kraft was a supervisor at Allstate for just two years prior to Patel's arrival, and hence it is unlikely that Kraft would have had the opportunity to supervise a new employee who lacked the ability to type. In essence, Patel argues that she was the first employee under Kraft who could not type 30 wpm and hence it was impossible for her to point to any other similarly situated employee who did receive WordPerfect training.[6]

■ Although the few discrimination cases involving allegations of inadequate training of which we are aware tend to support Allstate's position, *see Lopez*, 930 F.2d at 161 (comparing plaintiff's training with other employees' training); *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 347 (6th Cir.1988) (noting lack of record evidence that blacks were afforded training inferior to that afforded whites); *Shah v. Mt. Zion Hospital & Medical Center*, 642 F.2d 268, 271 (9th Cir.1981) ("To establish a prima facie case of discriminatory training, Shah was required to show that he was treated differently from other employees."), we need not resolve this issue. Even if we assume that Patel can establish a prima facie case of discrimination, we believe that Allstate has provided legitimate business reasons for its refusal to provide the alleged training requirement in question and that

---

**5.** According to *Lopez*, in order to make out a prima facie case, the plaintiff in a failure-to-train case must show: (1) that he is a member of a protected class; (2) that he satisfactorily performed the duties required in his position; (3) that the employer had a policy of providing on-the-job training; and (4) that he was not provided this training under circumstances giving rise to an inference of discrimination. *Id.* at 161.

**6.** We note that this claim contradicts Patel's assertion that other cash processors could not type 30 wpm yet received computer training. (Appellant's Br. 16). This assertion could not successfully oppose summary judgment because it is unsupported by any nonhearsay evidence. *Bombard*, 92 F.3d at 562. Moreover, Patel does not suggest any reason why she could not have deposed these other cash processors on this important question.

Patel has failed to advance sufficient evidence to rebut Allstate's proffered reasons.

Patel alleges insufficient training in three computer software programs (WordPerfect, Supercalc, and Dataease) and in business writing. Because Patel complains principally about the denial of WordPerfect training, we begin there. Allstate explains that Kraft refused to provide Patel with training in WordPerfect, a word processing program, because she could not type. Kraft believed Patel should know how to type before attempting to learn WordPerfect, and she set a speed of 30 wpm as a goal for Patel to achieve. Patel argues that Kraft's explanation is phony because "Kraft fabricated a conversation with the WordPerfect teacher in order to justify her arbitrary 30–wpm requirement for plaintiff taking WordPerfect training." (Appellant's Br. 22). Patel bases this charge of fabrication on Kraft's testimony that Dehmlow informed Kraft that achieving a typing speed of 25 wpm would be desirable before taking the WordPerfect class. Patel contrasts this with Dehmlow's testimony that she did not recall any such conversation and that she had never recommended to anyone in management that an individual be denied WordPerfect training until they had learned "some other skill." After reviewing the transcripts of the depositions, it is clear to us that Kraft did not mention Patel when she asked Dehmlow whether it would be a good idea for a person to achieve a certain typing speed before taking the WordPerfect class. Thus, it is not surprising that Dehmlow did not remember a conversation "about Gira Patel," which is how the question was phrased during Dehmlow's deposition. Moreover, Kraft never testified that Dehmlow "recommended" that Patel be denied WordPerfect training until she attained a certain typing speed; Kraft merely testified that Dehmlow said it would be "good" for someone taking the WordPerfect class to be able to type 25 to 30 wpm. Indeed, Dehmlow testified that "[i]t would be nice" if someone had a certain typing speed before he or she took the WordPerfect class. Accordingly, in our view, no reasonable factfinder could conclude that Kraft fabricated the conversation with Dehmlow.

Patel also argues that the 30–wpm requirement was pretextual because, when she approached the 30–wpm level, Kraft nevertheless decided that Patel would not be allowed to take the WordPerfect class. Patel conveniently omits the larger context in which this decision was made: Kraft testified that in June and July 1993 Patel was struggling in her core competencies, so WordPerfect training was going to be put on hold regardless. Kraft offers no basis for believing this explanation was pretextual.

Patel also argues that knowing how to use WordPerfect was "critical" to her ability to do her job and that Kraft admitted that the ability to use WordPerfect was "real important." Patel thus implies that Kraft's failure to permit Patel to attend the WordPerfect class demonstrates that the 30–wpm requirement was a pretext for denying her training in WordPerfect. We disagree. Even assuming that knowing how to use WordPerfect is critical to performing the duties of a cash processor, the evidence is undisputed that Kraft nevertheless honestly believed that knowing how to type was necessary in order not to be left behind in the WordPerfect class. *Helland v. South Bend Community School Corp.*, 93 F.3d 327, 330 (7th Cir.1996) ("Because a Title VII claim requires intentional discrimination, the pretext inquiry focuses on whether the employer's stated reason was honest, not whether it was accurate."). Because Kraft honestly believed that a certain typing speed was necessary in order to benefit from WordPerfect training, the fact that WordPerfect was necessary to carry out the duties of a cash processor would not enable a rational trier of fact to conclude that the 30–wpm requirement was pretextual.

We turn to the alleged denial of training in Supercalc and Dataease. With respect to Supercalc, Patel claims that the training she received was insufficient for her to carry out her duties, but we do not see how a reasonable factfinder could lay the blame for this at Kraft's doorstep. The evidence is undisputed that Kraft directed Nikides to instruct Patel in enough Supercalc so that Patel would be able to prepare her end-of-month reports (TPAAs). Moreover, it is also undisputed that the entire Supercalc course is not

needed to learn how to prepare TPAAs. Thus, whether Nikides did a poor job of teaching or Patel was slow in learning, there is no evidence that Kraft intentionally deprived Patel of what she needed to know about Supercalc. Similarly, with respect to Dataease, the evidence is undisputed that Patel's training was limited to what was necessary to perform the tasks for which cash processors used it. Accordingly, Patel has failed to present sufficient evidence from which a reasonable trier of fact could conclude that Kraft's reasons for not providing Patel with more training in Supercalc or Dataease were pretextual.

Next, as to the business writing class, the evidence is undisputed that the accounting department put its new employees through that class at some point in its training program. However, it is also undisputed that, by April or May 1993, Kraft and Schultz decided not to place Patel in the business writing class because Patel ·

> had been struggling with her day-to-day accountabilities; receipts, disbursements, collections, reconciliation. We didn't think it was fair to load more training on her at that time. We wanted her to learn her job skills, her core competencies, and then we would put her into other types of training courses when she met the level.

Patel argues that if she had been given training in business writing, she wouldn't have had to rewrite letters and faxes as Kraft repeatedly required her to do. Assuming that the business writing class would have cured any defects in Patel's writing, this fact alone would not permit a reasonable trier of fact to conclude that Kraft did not honestly believe that Patel should focus on her core competencies before taking on additional training. *Helland,* 93 F.3d at 330.

## B. Other Alleged Disparate Treatment

Although Patel primarily complains about the denial of training, she also contends that she was discriminated against in the terms and conditions of her employment in various other ways. Patel claims that Kraft: harassed her; refused to answer work-related questions and directed Patel's coworkers not to answer her questions; assigned Patel unusually difficult and complex files; and refused Patel permission to work overtime.

■ In support of her claim that Kraft harassed her, Patel states that Kraft required her to rewrite and retype letters and faxes because they did not "look right." However, Patel points to no specific examples of her writing demonstrating that Kraft's criticisms were unwarranted. Patel does state that on one occasion she used the phraseology employed by a more experienced co-worker but that Kraft nevertheless found the wording improper. Because we have no evidence as to what wording Patel borrowed from her co-worker, we are unable to assess the validity of Kraft's criticism.

Patel also identifies a series of relatively minor incidents that she claims constituted harassment. For example, Kraft required her to prepare an e-mail memo each month setting out her complete typing practice schedule, listing each day and the time when she would be practicing, rather than permitting Patel to indicate in a memo that she would be practicing every day at a particular time. In addition, Patel states that she alone among the cash processors was not allowed to retrieve a certain type of folder that was kept in Kraft's office; she recounts one instance in which Kraft reprimanded her in front of her co-workers in a hostile manner, thus causing her embarrassment; and finally, she points to Kraft's insistence that she take a typing test on a manual typewriter even though she had been practicing on a computer keyboard. We do not see how these various instances, even when considered together, could genuinely be considered actionable "harassment." *Cf. Pieczynski v. Duffy,* 875 F.2d 1331, 1336 (7th Cir.1989) (de minimis harassment not actionable under 42 U.S.C. § 1983).

■ Patel argues that Kraft discriminated against her by refusing to answer Patel's questions and also by directing Patel's co-workers to refrain from doing so. Initially, we note that Patel's allegation that her co-workers were directed not to answer her questions is based on hearsay. More important, however, even if we assume that Patel's version of events is entirely accurate, this hardly qualifies as discriminatory treatment given that Patel (the only cash-processor trainee under Kraft) was told to ask ques-

tions of the department trainer, Nikides, who spent six to seven hours per day with Patel during her training period.

■ Patel next argues that she was discriminated against because Kraft assigned her unusually difficult and complex files. Although some of the accounts were indeed more complex than average, the record reveals that Nikides assisted Patel every day to help resolve the complex aspects of these accounts.

■ Finally, Patel claims that Kraft discriminated against her by refusing to allow Patel to work overtime while permitting other employees to do so. However, Kraft told Patel that the reason why she was not allowed to work overtime was so that Kraft could see if Patel—the only cash-processor trainee under Kraft at the time—could complete her work in an eight-hour day.[7] Allstate, which is not required to allow its employees to work overtime, has thus provided a legitimate, nondiscriminatory business reason for not allowing Patel to work overtime. Patel offers no basis for believing that Kraft's reason was pretextual.

Patel has offered no evidence from which a reasonable trier of fact could conclude that the other alleged instances of disparate treatment were in fact instances of disparate treatment. Because Allstate has offered legitimate business reasons for refusing to provide the training that Patel claims she was denied, and because the other evidence in the record would not enable a reasonable factfinder to conclude that Patel was subject to discriminatory terms and conditions of employment, we hold that the district court did not err in granting Allstate's motion for summary judgment.

### III. CONCLUSION

The judgment of the district court is Af-FIRMED.

---

7. In her brief on appeal, Patel claims that Kraft based her refusal to allow Patel to work overtime on a departmental rule that forbade trainees from working overtime, when in fact departmental rules permitted trainees to work overtime as long as they were supervised. However, the record, specifically Patel's own deposition testimony, reveals that the actual reason given by Kraft was the reason we noted in the text.