**Dharam V. BAHL, Plaintiff–Appellant,**

**v.**

**ROYAL INDEMNITY COMPANY and Royal Insurance Company of America, Defendants–Appellees.**

**No. 96–1810.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 28, 1996.

Decided May 28, 1997.

James V. Daffada, George LaCorte, Kara-cic & Daffada, James A. Roth (argued), Chicago, IL, for Plaintiff-Appellant.

Michael T. Roumell, Tracey L. Truesdale (argued), Murphy, Smith & Polk, Chicago, IL, for Defendants-Appellees.

Before POSNER, Chief Judge, EASTERBROOK and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

After he was fired as a property underwriter for Royal Indemnity Company ("Royal Indemnity"), Dharam Bahl brought this suit alleging that his former employer willfully discriminated against him and terminated his employment on the basis of his age and national origin. The district court granted the defendants' motion for summary judgment on both claims. Mr. Bahl now appeals the entry of summary judgment on his claim of discrimination based on national origin pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A. *Facts*

#### 1. Mr. Bahl's employment history

Dharam Bahl was born in India in 1944. He earned his bachelor's and master's degrees in the United States and worked as a property underwriter in this country for more than fifteen years. From 1987 until his discharge on April 14, 1994, he was employed by Royal Indemnity in its Royal Global Division ("Royal Global") office in Chicago, Illinois.[1] His primary responsibility was underwriting international or global property insurance for companies with facilities in two or more foreign countries. As a property underwriter, Mr. Bahl was required to evaluate the risk of insuring a particular piece of property. This responsibility required that he analyze such factors as the construction of the building, its occupancy, fire protection, internal and external exposures to hazards and loss, and the property's history of loss at that site. Based on this information, he determined whether it was desirable to insure the property. Once he found the property insurable, he then determined both the rates to be used in setting the insurance premium and the amount of deductibles allowed. For policies that carried a deductible of less than $100,000, state insurance laws regulated the rate to be charged. When a policy's deductible was $100,000 or more, however, Mr. Bahl, as the underwriter of the policy, determined the rate of insurance. In those cases, he was required by state law to document his method for determining the rate in the policy file. This documentation was required so that the insurance company could demonstrate that it was not pricing risks arbitrarily or unfairly.

Mr. Bahl's title in the Chicago office of Royal Global was first Midwest Regional Property Manager and later Global Account Executive; however, his duties remained the same under both appellations. His supervisor in that office was Raymond L. Trahant, Jr., the Midwest Regional Manager. Mr. Bahl also reported to the North American Underwriting Manager in New York concerning his underwriting duties. The two individuals who held that position during Mr. Bahl's employment were Joe Gray and Al Colosimo. The reporting senior of Gray, Colosimo and Trahant was the Vice President for North American Operations, Alan Driscoll. Driscoll joined Royal Indemnity in 1991 and became its Vice President in 1993; he was charged with overseeing the Royal Global operations of the New York, Chicago and Los Angeles offices.

Within months of Driscoll's arrival at Royal Indemnity in 1991, the two underwriting managers complained to Driscoll that Mr. Bahl would not take direction and was uncooperative. They also stated that, at times, Mr. Bahl's submissions to the New York office for approval were incomplete and lacking critical details. Shortly thereafter, when Driscoll and Trahant were discussing Mr.

---

1. Mr. Bahl's employer, Royal Indemnity, is a Delaware corporation with its principal place of business in Charlotte, North Carolina. Royal Insurance Company of America, the other defendant and sister company to Royal Indemnity, is an Illinois corporation. Both defendants are licensed to do business in Illinois; they provide property and casualty insurance.

Bahl's abilities, Trahant assured Driscoll that, although compliance had been an issue at one time, it no longer was a problem, and that all of the Chicago office's policy files had been brought into compliance. Driscoll himself recounted two occasions on which he questioned Mr. Bahl's work and lacked confidence in his abilities as a result of those discussions.[2]

Mr. Bahl's performance was reviewed on an annual basis by his supervisor, Trahant. His performance reviews during the first five years of employment were satisfactory.[3] In the 1992 performance review, Trahant commented that Mr. Bahl "must become computer competent. Do whatever it takes to become *very* familiar with ... property filings and domestic rules and regulations in general." R.23 at 11 para. 34. He also noted that an action point agreed upon by Trahant and Mr. Bahl was that "all business will be in compliance with state, Royal USA regulations." *Id.* at 145. His overall comments, however, were positive:

> [Mr. Bahl] continues to do a very good job. Respected by all the brokers for his professional approach. Has exceeded his premium goals. He is very dependable and loyal. His performance is consistent with time in job and responsibilities. He grows to the demands made on his job.

R.25 at 159.

However, Mr. Bahl's performance review for 1993 was rated "needs improvement." According to Trahant, Driscoll directed him to give Mr. Bahl that rating, but Trahant did not agree that it was appropriate. In the written text of Trahant's review, Trahant separately rated Mr. Bahl's job knowledge as very good and commented that Mr. Bahl was dependable and worked well with co-workers to accomplish the company's and the regional department's goals. About one week later, on April 14, 1994, Driscoll told Mr. Bahl that his employment was terminated. In the following section, we shall examine in greater detail the circumstances that preceded that termination.

### 2. The audit examination

According to Royal Indemnity, it was the company's examination into the rating and underwriting practices of the Royal Global division that led to Mr. Bahl's lower 1993 evaluation and eventual termination in 1994. Royal Indemnity, concerned about the compliance of its insurance practices with state insurance laws, had its Market Conduct Compliance Department conduct an examination of the rating and underwriting practices in Royal Global. This review of policies written by Royal Global was meant to simulate an examination conducted by a state insurance department and to identify potential violations so that Royal Global could take corrective action. The examination was led by the Regulatory Compliance Division Manager, Richard Ballantine.

Following this examination in November 1992, the findings were distributed to members of Royal Global's management, including Tom Brown, Managing Director, and

---

**2.** The first situation concerned a policy for boiler and machinery that Mr. Bahl wanted to insure for a risk limited to 25–50 million dollars. When Driscoll expressed his concern that this limit was very high, Mr. Bahl was unable to answer any of Driscoll's questions concerning the property's exposures to loss—the type of machinery, the products the client manufactured or how the manufacturing was done. Mr. Bahl was unable to explain how he evaluated the risk involved in that circumstance. In a second instance, involving a loss of approximately 2 million dollars on an account, Mr. Bahl again was unable to explain specific details concerning the account to Driscoll's satisfaction. According to Driscoll, he had not considered some of the factors that an underwriter must consider in evaluating whether to write a particular risk. In that case, Mr. Bahl did not know what the construction of the building was and told Driscoll that he did not need to know the type of construction because he was underwriting solely the contents of the building. Driscoll responded that the construction of the building was one of the factors that an underwriter must consider in evaluating whether to write a particular risk.

**3.** In 1987, on a scale that rated performance as "unsatisfactory, less than effective, effective, very effective, excellent and outstanding," Mr. Bahl was rated as "very effective." From 1988 through 1991, when performance was measured on a scale of "does not meet, meets most, meets/exceeds, and far exceeds," his overall rating was "meets/exceeds." In 1992 no overall performance rating was given. Instead, the evaluator was asked to write his overall view of the jobholder's performance.

Driscoll, who was about to become Vice President of North American Operations for Royal Global. On January 29, 1993, upon receipt of the report, Brown wrote to Driscoll of his disappointment and concern with the findings of the market conduct examination. He believed that there had not been strict adherence to statutory requirements and ordered Driscoll to bring the files into compliance:

I have to view these findings as a serious failure on the part of Management. It typifies the hands off style which I abhor. I need to know the following by urgent return fax:

Are there grounds for immediate termination for the responsible Underwriters and Underwriting Management? If not, why not?

I presume that compliance is a feature of job descriptions and authority levels. If not, why not?

I want your immediate concentrated efforts applied to rectifying all non compliance issues. I do not care if you work nights and weekends, but I want your assurances that these will be rectified immediately, and I want a guaranteed deadline by which you will meet compliance totally.

R.26 at 361–62. Once Driscoll received this letter, he issued a memorandum to Royal Global's Underwriting and Rating staff to review all their new and existing policy files to ensure that the files were in compliance. He also arranged for a mandatory seminar on compliance issues for all underwriters. In early 1994, Royal Global conducted internal audits of its offices in New York, Chicago and Los Angeles.

The audit of the Chicago office, conducted between January 31 and February 4, 1994, reviewed property and casualty account files and examined both compliance and underwriting issues. The audit team included Driscoll; Ballantine, Regulatory Compliance Division Manager; and John Dugan, Underwriting Account Executive in Royal Global's New York office. Ballantine reviewed the accounts for compliance with state law, and Driscoll and Dugan reviewed them from an underwriting standpoint. The Chicago office had prior notice of the audit and the auditors prepared written work sheets documenting

their findings for each account file they reviewed. Mr. Bahl criticized the audit procedure, however. He claimed that there was no notice of the audit format, no work sheets provided, no list of the accounts to be reviewed and no checklist of the elements the auditors were checking.

The auditors were quite critical of Mr. Bahl's files. Ballantine noted, on his work sheets and in the summary of his findings, that most of the property files he reviewed did not contain the necessary rates documentation and that the lack of documentation was a serious violation. Ballantine's section of the summary, entitled "Compliance," stated:

Property—it appears that most files did not have the necessary documentation from a regulatory perspective. No full process for rate development was in the file as required. The majority of the files reviewed were eligible for various rating plans[;] however, no documentation was present identifying the rating plan used in the rate calculation. This is a serious violation.

Property underwriters in Chicago were brought into New York for a special session conducted by the market conduct people of Royal USA. There should be no reason for a misunderstanding on the part of the underwriters as to what is required in the area of compliance.

R.26 at 401–02. Driscoll and Dugan concurred in that assessment of Mr. Bahl's property files. Dugan's report, after evaluating eleven files, also pointed out the lack of underwriting documentation and assessment. Dugan rated the files as poor or barely adequate in many categories. Driscoll's own observations were based on a review of only two property files; nevertheless, his summary of the audit was equally critical of Mr. Bahl's files and his procedures in underwriting and compliance.

After the audit was completed and the work sheets were compiled, Driscoll filed a written report. He pointed out many deficiencies in the property files. He observed that the documentation was so poor that a reviewer of that file would not be able to determine what had been done. He also

noted that, in many cases, reinsurance that had been purchased was either excessive or insufficient to cover Royal Indemnity's needs. Driscoll concluded that the results of the audit, overall, were unacceptable. This audit report was sent to the Chicago office along with the work sheets and the audit summary. The report requested a written response to the audit by April 1.

On or around March 24, 1994, Trahant sent Driscoll a reply to the audit. It contained Mr. Bahl's line-by-line written responses to the individual work sheets, exhibits in support of his responses, and a memorandum detailing his comments to the audit summary. Trahant did the same. Mr. Bahl claimed that he satisfactorily responded to each issue raised by the auditor and demonstrated that, where warranted or required, all the account files contained rates documentation.[4] Trahant also commented that Mr. Bahl's files prior to the audit were in good order and contained the necessary documentation on how rates were developed.

However, after Driscoll received Mr. Bahl's and Trahant's responses to the audit, he concluded that the responses were totally inaccurate and inadequate. Driscoll claimed that Mr. Bahl's responses showed a lack of appreciation for the severity of the deficiencies found by the auditors and a complete lack of understanding of the issues involved in compliance. Driscoll noted that, had a state insurance auditor discovered the deficiencies, possible legal consequences—such as substantial fines or even the loss of Royal Indemnity's license to do business in the state-could have resulted. Accordingly, based on the audit results and Mr. Bahl's and Trahant's inadequate responses, Driscoll determined that both Bahl and Trahant should be discharged.[5] Mr. Bahl was terminated on April 14, 1994, about two months after the audit had been conducted and about a week after he received his performance review for the 1993 calendar year which pronounced his overall rating as "needs improvement." He was replaced by a 33 year-old woman. After his termination, Mr. Bahl filed a charge of discrimination with the Illinois Department of Human Rights. Upon receipt of his right-

4. At his deposition, Mr. Bahl agreed that some of the audited files did not contain the rates development documentation that the auditors were looking for. Concerning one file, Mr. Bahl admitted that the rates development sheet had not been transferred into the current policy file from the previous year's file when the policy was renewed. There was no documentation in the Ford Motor Company and Upjohn Company account files, either. Mr. Bahl did not dispute that fact, but stated that, based on his judgment, he felt the overall pricing was reasonable and acceptable. According to Mr. Bahl, therefore, he demonstrated that, where appropriate, all account files contained rates documentation. According to the defendants, Mr. Bahl produced only two rating sheets.

5. In a memorandum to Joyce Wheeler, Royal Indemnity's Corporate Counsel, Driscoll stated, in pertinent part:

Dharam Bahl's response [to the audit report] clearly indicates that he still has absolutely no idea of what is proper documentation. We have provided him with written correspondence on how to comply and we brought him into New York and specifically did tell him about the details of documenting a file. He apparently does not listen or isn't asking any questions when he doesn't understand. I have reviewed the responses and nowhere does he clearly document the rates. One file, R.P.

Scherer, does have attached to it a note which tries to show the justification of the rate process. (However, I am amazed how we'all missed this in the file.) It is not sufficient for compliance of state regulations. It is clear he does not acknowledge nor recognize any of the deficiencies we pointed out in our inability to read his files or follow the underwriting thought process.

. . . .

It is obvious that both Ray [Trahant] and his underwriter, Dharam [Bahl], clearly do not understand the issues that confront them. They are more interested in providing excuses and down playing the significance of the times. The responses also indicate that they do not have the knowledge to do their jobs.

[I]t is clear to me that Dharam Bahl clearly does not possess the skills to continue in the job of an underwriter for Royal Global. All of our accounts are significant and may have both U.S.A. and foreign exposures. He has put the ability of this company to do business in jeopardy by continuing to violate state laws. In addition, because of his poor underwriting practices he has exposed this company to losses that we shouldn't be.

We cannot continue to have this person occupy a role in our company. I would like to move forward with an immediate removal of Bahl from our employment.

R.26 at 502–04.

to-sue letter, he brought this action in United States District Court for the Northern District of Illinois.

### 3. Discriminatory comments

Mr. Bahl claims in his complaint that Driscoll directed Trahant to terminate Mr. Bahl because of his national origin. He submits that both Driscoll and Gray made derogatory comments to Trahant suggesting that Mr. Bahl was "not the type of person we want to put up in front of the brokers." R.32 at 85. According to Trahant's testimony, they criticized Mr. Bahl's English and asserted that he had to "think Indian first" before thinking in English. They referred to Mr. Bahl as one of "those kind of people." R.32 at 101. Trahant testified that, "[s]hort of actually coming out and using the words we just want to get rid of him because he's an Indian, they said everything else." R.32 at 103. Trahant reported one specific incident. Around December 1993, Driscoll told Trahant that he wanted Bahl fired; he then said, "[T]he only thing I can tell you is that this [your failure to fire Bahl] has hurt you personally." R.32 at 81. Trahant refused to terminate Mr. Bahl without a reason for the firing from Driscoll; but Driscoll never gave Trahant a justification for the termination. Trahant asserted in his deposition that Mr. Bahl performed his job competently and satisfactorily. Although Driscoll's purported reason for terminating Mr. Bahl was the compliance concern raised by the 1994 audit, Trahant stated that Driscoll began requesting that Bahl be fired at least two years prior to the audit.

Mr. Bahl stated that, in his dealings with Driscoll and Gray, he felt uncomfortable. He believed that Driscoll did not treat him professionally. For example, Driscoll and Gray would cut off conversations with Mr. Bahl and would turn to Trahant, saying that they did not understand Mr. Bahl and that he did not understand them. Mr. Bahl informs us that he is fluent in English and that no other associate has expressed a problem communicating with him.

### 4. Results of the Los Angeles office audit

In July 1994 an audit was conducted in Royal Global's Los Angeles office. The audi-
tors concluded that the accounts reviewed were unacceptable when measured against Global's underwriting standards. They noted that certain accounts did not have documentation on rates and were difficult to follow. The auditors also found that no set structure was being followed. As a result of the audit, Senior Property Underwriter Larry Reeves, a white non-Indian, was given the choice of resigning or being terminated. Reeves resigned.

### B. *Decision of the District Court*

The district court granted summary judgment to Royal Indemnity. It concluded that the audit results gave a legitimate, nondiscriminatory reason for Driscoll's decision to terminate Mr. Bahl and that Mr. Bahl did not prove that his employer's reason was pretextual. The court also determined that the derogatory comments of Driscoll and Gray were isolated comments, insufficient as direct evidence of his employer's discriminatory intent because there was no nexus between the isolated statements and the termination decision. Of importance to the district court was the unrefuted fact that Ballantine exhibited no discriminatory intent concerning Mr. Bahl. Thus Ballantine's conclusion—that Mr. Bahl's files demonstrated noncompliance with company and regulatory procedures—gave a legitimate nondiscriminatory termination reason. On that ground the court dismissed the national origin discrimination claim.

## II

## DISCUSSION

### A.

We conduct plenary review of a district court's entry of summary judgment. *Vitug v. Multistate Tax Comm'n,* 88 F.3d 506, 511 (7th Cir.1996). However, we are obliged to review the record in the light most favorable to the nonmoving party and to draw all reasonable inferences in that party's favor. *Weisbrot v. Medical College,* 79 F.3d 677, 680 (7th Cir.1996). We shall uphold a summary judgment whenever "the pleadings, deposi-

tions, answers to the interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir.1997). Nevertheless, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). To avoid summary judgment, the nonmovant bears the burden of setting forth "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). An issue is genuine if it must be decided at trial because the evidence, seen in a light that favors the nonmovant, would permit a reasonable factfinder to resolve the issue in favor of the nonmovant. *Patel,* 105 F.3d at 370. In this case, Mr. Bahl submits that there are genuine issues of material fact concerning the defendant's proffered reason for his termination.

### B.

■■■ Title VII establishes that it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual ... because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). An employee may prove that an employer violated this provision by providing either direct [6] or indirect [7] evidence of unlawful discrimination. In the district court, Mr. Bahl attempted to make his case using both a direct and an indirect evidence theory. In this court, he has refined his presentation, prudently we believe,[8] and has confined himself to the indirect evidence approach. Under the indirect evidence approach, a plaintiff must establish a prima facie case. *Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1261 (7th Cir.1993), *cert. denied*, 511 U.S. 1005, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994). Once the plaintiff employee successfully establishes his prima facie case, a presumption of discrimination is created and the burden shifts to the defendant employer to produce a valid and nondiscriminatory reason for the dismissal. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Vitug*, 88 F.3d at 515. If the defendant discharges its burden of production by rebutting the prima facie case, the plaintiff then must show that the defendant's proffered reason for the dismissal was false and only a pretext for discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507–08, 113 S.Ct. 2742, 2747–48, 125 L.Ed.2d 407 (1993). Thus the plaintiff always has the ultimate responsibility of proving that he was the victim of intentionally discriminatory conduct by his employer.

### C.

■■ The focus of Mr. Bahl's appeal is a challenge to the reasons given by Royal In-

---

6. *See Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir.1997); *Emmel v. Coca–Cola Bottling Co.*, 95 F.3d 627, 629 (7th Cir.1996) (offering, as an example of direct evidence, an employer's statement "I did not hire you because you are a woman"). We have defined "direct evidence" as evidence which, " 'if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption.' " *Plair, supra* (quoting *Randle v. La-Salle Telecomms.,* Inc., 876 F.2d 563, 569 (7th Cir.1989)).

7. When the evidence of discrimination is indirect, we apply the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to Title VII claims.

8. When Mr. Bahl first presented his claim to the district court, he asserted that the derogatory statements made by Driscoll and Gray were direct evidence of discriminatory intent. The district court implicitly rejected that argument, first by noting that Trahant had admitted that Driscoll did not make any direct comments about Mr. Bahl's national origin, and next by stating that "[w]hether the evidence is considered direct or indirect is immaterial ... because ultimately plaintiff must show that but for his national origin he would not have been terminated." R.40 at 15 (citing *Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1261 (7th Cir.1993), *cert. denied*, 511 U.S. 1005, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994)). Our independent examination of the record makes it clear that the district court was correct in determining that these statements are not direct evidence of discrimination.

demnity for terminating his employment. In his view, the evidence creates a genuine issue of triable fact as to whether his employer's justification for his dismissal was pretextual. Mr. Bahl asserts that the evidence of record demonstrates the existence of a genuine issue of material fact concerning the veracity of Royal Indemnity's proffered reason for his discharge. In his view, the record establishes that (1) the audit was improperly and irregularly conducted; (2) Mr. Bahl's documentation was not sloppy and would not jeopardize Royal Indemnity's ability to practice in Illinois; (3) his account files were set up as instructed, were in good order and in compliance, and contained the rate development documentation where warranted; and (4) Dugan, one of the auditors, declared in his affidavit that Mr. Bahl's files were well ordered and that he found no substantial problems in those files that would justify termination. In light of this evidence, Mr. Bahl urges that a jury should determine whether Royal Indemnity's reason for firing Mr. Bahl was pretextual.

■ "An employee may establish pretext indirectly by proving one of the following: '(1) Defendant's explanation had no basis in fact, or (2) the explanation was not the "real" reason, or (3) ... the reason stated was insufficient to warrant the [adverse job action].'" *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir.1996) (citations omitted). In this case, it is the first two parts of this analysis that are contested. Moreover, it is important to remember that, when we consider whether an employer's justification for dismissing its employee is pretextual, the inquiry is not whether the reason for the firing was a correct business judgment but whether the decisionmakers honestly acted on that reason. *Emmel v. Coca–Cola Bottling Co.*, 95 F.3d 627, 633 (7th Cir.1996); *see McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 799 (7th Cir.1997) (citing cases); *Mulero–Rodriguez v. Ponte, Inc.*, 98 F.3d 670, 674 (1st Cir.1996).

Royal Indemnity's proffered legitimate, nondiscriminatory reason for Mr. Bahl's ter-

mination is the low evaluation of Mr. Bahl's performance by the audit team. There can be little question that the record clearly establishes that Royal Indemnity had a factual basis for its decision. The record clearly reflects that Royal Indemnity's management had been concerned about compliance with state insurance regulations for several years and that Driscoll had discussed, on several occasions, his concerns about Mr. Bahl's specific failure to follow the proper documentation procedures required for compliance. The company began examining its rating and underwriting practices at the end of 1992. Once Ballantine and his Market Conduct Compliance Department discovered that company files lacked the required rating documentation, Royal Indemnity's management set about rectifying all noncompliance issues. The 1994 audit of the Chicago office was part of that plan to ensure that its files were in compliance with statutory and company requirements. Of the three auditors who conducted the audit, Ballantine was responsible for the company's main concern, compliance with state law requirements; he found that most of Mr. Bahl's files did not contain rate documentation and were not in satisfactory order. Driscoll's and Dugan's audit reports were also very critical of Mr. Bahl's files. Therefore, all three auditors found serious deficiencies in Mr. Bahl's work. After he reviewed Mr. Bahl's response to the audit results and found it inadequate, Vice President Driscoll terminated him. Given the unanimous view of the audit team, especially the unimpeached estimation of Ballantine who had responsibility to evaluate the crucial issue of state law compliance, we must conclude that the company had a basis for its decision and that the reason was sufficient to warrant Mr. Bahl's discharge.

■ Mr. Bahl nevertheless points to evidence that, in his view, demonstrates that some of the files were not as bad as they may have appeared and that he provided documentation when he believed it was warranted. He notes that his immediate supervisor, Trahant, believed his performance to be within tolerable limits [9] and that auditor Du-

---

9. In his deposition, Trahant evaluates Mr. Bahl's submitted work:

[M]ost of the submissions going in to New York were reviewed by me and signed off by me,

gan later submitted an affidavit that contradicted his own critical audit reports. This evidence does not create a genuine issue of triable fact as to whether Royal's reason for firing Mr. Bahl was a lie or a phony reason. *See Russell v. Acme–Evans Co.*, 51 F.3d 64, 68 (7th Cir.1995) (explaining that pretext "means a lie, specifically a phony reason for some action"). The only issue is whether management honestly held these views, not whether it was mistaken. In essence, Mr. Bahl is asking that this court take on the mantle of a super-personnel department reviewing the business decisions of his employer. We shall not assume such a role. *Emmel*, 95 F.3d at 633; *Sample v. Aldi, Inc.*, 61 F.3d 544, 551 (7th Cir.1995). Nor can Auditor Dugan's recantation provide a basis to question that management had these views. At the time of his termination, Mr. Bahl's performance evaluation from the audit was inadequate in the eyes of all three evaluators. In addition, it is clear from the record that his job performance was considered substandard in the years prior to the audit, and that both Mr. Bahl and Trahant were warned of those inadequacies.[10] *See Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1263 (7th Cir.1993), *cert. denied*, 511 U.S. 1005, 114

S.Ct. 1372, 128 L.Ed.2d 48 (1994) (noting that the plaintiff "failed to adequately address the defendant's evidence of her substandard job performance in [prior years]").

Finally, Mr. Bahl suggests that there is a genuine issue of triable fact as to whether the proffered reason for his discharge—consistent inadequate performance—was honestly held. He essentially relies upon two factors: (1) the remarks allegedly made by Mr. Driscoll and another employee that, in Mr. Bahl's view, evidence ethnically based animus with respect to the discharge; (2) more favorable treatment given to another similarly situated employee who was not of Indian descent.

Mr. Bahl submits that the derogatory comments made about him reflect the real reason for his termination. According to Mr. Bahl, there is a nexus between his employer's decision to terminate him and the discriminatory statements based on national origin that were directed against him by Gray and Driscoll. In the first place, he points out, only Gray and Driscoll had difficulty understanding Mr. Bahl, and Driscoll was the decisionmaker who terminated Mr. Bahl. Mr. Bahl also offered evidence that Driscoll repeatedly

---

and as far as I was concerned, the submissions contained the information necessary to make a decision on if this risk could or could not be written by Royal Global. There were times when additional information would have been nice. The more information you have, of course, the nicer it is, but I'm talking about the nuts and bolts were there, basics were there.

R.32 at 68. He then describes Driscoll's concern, within months after Driscoll joined Royal Indemnity, that Mr. Bahl was not the right person for the job:

[Driscoll] said, "you know, we don't think that Dharam is really the right person for that slot." And I would say, "Well, what is that based on?" He said, "Well, we've observed some of the submissions and we've talked to him, and we don't think that he really has a handle on the situation in Chicago generally from an underwriting standpoint."

And I said, "Well, you know, Alan, I disagree. He's been with us from the inception when the office opened, he's done a very good job, the brokers like him, he's made money, and," I said, "you know, at the end of the day, what else is important?" I said, "Everything else, as far as I'm concerned, is in order." He said, "Well, what about the legality of, you know, compliance and all that?" And I said, "Well, as you know, that became an issue when Claude came on board. That was deter-

mined to be a problem." I said, "We've corrected that." I said, "All of our policies have been brought into compliance, so that is not a problem in this office, and ongoing, I do not anticipate that it will be a problem." "Well, okay." He let that go.

R.32 at 70–71.

**10.** In his deposition, Trahant reported another conversation with Driscoll after the underwriting manager Al Colosimo had shown Driscoll one of Mr. Bahl's submissions:

Alan called me, and he said, ... "Have you seen this?" I said, "Yes, I've seen it." "And you approve of this?" I said, "Yes, I approve of that. What's wrong?" "This is not a proper submission." "Specifically what is wrong?" Again, it was on the form that they wanted it submitted on, the engineering, the loss ratio, all of this was attached, the pertinent pieces of it. "Specifically what do you want? What is lacking?" "No, it's just not a good submission. You've got to get rid of that guy, Ray. That's it. You've got to get rid of him."

R.32 at 75. Trahant also stated in his deposition that he discussed the problems Driscoll noted in Mr. Bahl's submissions "on every submission they criticized." R.32 at 78.

pressured Trahant to fire Mr. Bahl and clearly implied that he wanted to get rid of Mr. Bahl because he was Asian Indian. As Trahant testified, "Short of actually coming out and using the words we just want to get rid of him because he's Indian, [Driscoll] said everything else." R.32 at 103. According to Mr. Bahl, a factfinder could reasonably infer that comments by Driscoll and Gray about "those people" and criticisms of Mr. Bahl's English and his "image" referred to Mr. Bahl's Indian origin. Moreover, he asserts, these statements are not remote or isolated; they reasonably could be linked to the decision to terminate Mr. Bahl.

■ When considering whether the derogatory comments can be considered evidence of pretext and therefore of discrimination, we note first that Mr. Bahl offered no evidence that Gray was a decisionmaker or that he was able to influence the firing decision. Therefore the remarks attributed to Gray are not actionable under Title VII.[11]

■ Because Driscoll fired Mr. Bahl, we must consider his statements as the comments of the decisionmaker.[12] Our examination of the record convinces us that the district court was on very solid ground when it concluded that Driscoll's remarks are "too attenuated to be linked to his decision to terminate Bahl's employment." R.40 at 16. The remarks were isolated, "stray workplace remarks" that are not clearly linked to the decision to terminate Mr. Bahl's employment. See Rush v. McDonald's Corp., 966 F.2d 1104, 1116 (7th Cir.1992) (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 251, 109 S.Ct. 1775, 1791, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring)). Such comments cannot defeat summary judgment in favor of

an employer unless they are both proximate and related to the employment decision in question. See McCarthy v. Kemper Life Ins. Cos., 924 F.2d 683, 686–87 (7th Cir.1991); Rush, 966 F.2d at 1116 ("[I]n order to suffice as evidence of racial animus in support of a claim of disparate treatment, the racial remarks must be relatively contemporaneous to the termination of employment and must be 'related to the employment decision in question.'") (citation omitted). This record does not contain the proper quantum or quality of evidentiary proof to support an ultimate finding of discrimination.

Finally, Mr. Bahl points out that Larry Reeves, the Senior Property Underwriter in the Los Angeles office of Royal Global, lost his job because of the audit deficiencies. He was offered the option of voluntary resignation or termination, and he choseto resign. Mr. Bahl asserts cursorily that Reeves was not terminated and therefore received better treatment than Mr. Bahl did. However, it is undisputed that, had Reeves not resigned, he would have been terminated. Without further elaboration by Mr. Bahl with respect to the similarities and dissimilarities of the two cases, the comparatively minimal difference in treatment accorded the two individuals, both of whom were voluntarily terminated, is simply not " 'adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion.' " O'Connor v. Consolidated Coin Caterers Corp., —— U.S. ——, ——, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996) (quoting International Bhd. of Teamsters v. United States, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977)) (emphasis omitted).

---

11. See Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1400 (7th Cir.1997) ("If the other employee merely utters a hostile stereotype, he is not manipulating the decision."); Weisbrot v. Medical College, 79 F.3d 677, 684–85 (7th Cir. 1996) (concluding that reference to plaintiff as "older lady" was not, by itself, "proof of actionable discrimination, even if repeated," because it did not reflect the view of decisionmakers and did not cause speaker to act on it) (quoting Shager v. Upjohn Co., 913 F.2d 398, 402 (7th Cir.1990)); see also Mulero–Rodriguez v. Ponte, Inc., 98 F.3d 670, 675–76 (1st Cir.1996) (reversing summary judgment decision on ground that reasonable factfinder could infer from the record

that company accountant was in position to influence employer's decisionmaking); Ayala–Gerena v. Bristol Myers–Squibb Co., 95 F.3d 86, 97 (1st Cir.1996) (concluding that references to a "black mafia" could not constitute direct evidence of discrimination because they were made by non-decisionmakers).

12. See Wallace, 103 F.3d at 1400 (concluding that plaintiff's effort to build a prima facie case on a director's remark that "all Americans are stupid" failed because plaintiff was fired by the general manager, not the director).

**1294**

## Conclusion

Mr. Bahl has failed to carry his burden of demonstrating that his employer's proffered reason for terminating him was pretextual and that the real reason was discriminatory. We conclude that, on this record, there is no genuine issue of triable fact as to whether the reason for Mr. Bahl's termination was discrimination based on his national origin. For the reasons set forth above, the decision of the district court to grant the defendants' motion for summary judgment is affirmed.

AFFIRMED.