# In the
# United States Court of Appeals
## For the Seventh Circuit

---

No. 03-2211

CAROL HOTTENROTH,

*Plaintiff-Appellant,*

v.

VILLAGE OF SLINGER,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Eastern District of Wisconsin.
Nos. 01-CV-1048 and 02-CV-207—**Rudolph T. Randa**, *Chief Judge.*

---

ARGUED DECEMBER 12, 2003—DECIDED OCTOBER 28, 2004

---

Before COFFEY, RIPPLE, and KANNE, *Circuit Judges.*

COFFEY, *Circuit Judge.* Carol Hottenroth sued her employer, the Village of Slinger, Wisconsin ("Slinger"), asserting various claims of discrimination in violation of Title VII of the Civil Rights Act of 1964. The district court, Judge Rudolph T. Randa presiding, consolidated two separate actions filed in federal court by Hottenroth alleging discrimination in her employment and retaliation, in violation of 42 U.S.C. § 2000e *et seq.*, as well as state law breach of contract. Slinger moved for summary judgment for failure to state a claim and Hottenroth filed a cross-motion for partial summary judgment on her retaliation and breach of contract claims. The district court, in a written opinion, granted

Slinger's motion for summary judgment, denied Hottenroth's cross-motion for summary judgment on her retaliation claim and dismissed Hottenroth's Title VII claims in both actions, while declining to exercise pendent jurisdiction over her state law claims. Affirmed.

## I.  BACKGROUND

In November of 1995, Hottenroth applied for a position as an apprentice journeyman-lineman[1] for the Village of Slinger, was hired and entered into an apprentice indenture agreement[2] which required that she complete a total of 7,720 hours of work experience under the supervision of a certified journeyman-linemen and 640 hours of related off-the-job training[3] by November 13, 2000. In return, Hottenroth was compensated and her tuition expenses were paid by Slinger. In addition, Slinger also agreed to provide Hottenroth with "such instruction and experience that will enable the apprentice to qualify as a line repairer at the completion of [the] apprenticeship." Hottenroth failed to complete her training and, thus, never received her journeyman-lineman certification. She was discharged by Slinger on May 29, 2001 for the reasons set forth herein.

Between 1995 and 1997, Hottenroth worked as an apprentice for Slinger as an employee of the Village assigned to the electric utility department. During that time period,

---

[1]  Among other things, journeyman-linemen erect and maintain electrical equipment, power and communication lines.

[2]  An indenture agreement is defined as "[e]very contract or agreement entered into by an apprentice," Wis. Stat. § 106.01(2), whereby that person agrees to "receive from or through the employer, in consideration for his/her services, in whole or in part, instruction in any trade, craft or business." Wis. Stat. § 160.01(1).

[3]  Meaning classwork and other off-the-job training which Hottenroth received at the Chippewa Valley Technical College.

the staff of the utility consisted of the Utility Manager, Orloff Styve, a certified journey-man-lineman, Marvin Amsler, and Hottenroth. Styve kept track of Hottenroth's hours and made sure she was given the opportunity to receive the proper training to qualify her for a journeyman's card under the indenture agreement between Slinger and herself. Styve would also meet with Hottenroth every few months to discuss her progress under the indenture agreement. The record reflects that Hottenroth's performance was formally evaluated on three separate occasions, in January of 1995, May of 1996 and January of 1997 and that she received marks that reflected a rating of "Acceptable" to "Above Average" on all three.[4]

In September of 1999, Mary Jo Lange was hired by Slinger as the new Director of Public Works, Utility Director and Village Engineer replacing Orloff Styve. At that time, Lange assumed Styve's duties as supervisor of the utility crew, which now included Amsler, who was promoted to foreman in 1997, Denis Fitzgerald, a certified journeyman-lineman hired in 1997, and Hottenroth.

---

[4] The description of the term "Acceptable" on the face of the completed Performance Evaluation Reports states: "This rating category should be considered as a suggestion for improvement, but does not indicate substandard performance unless indicated by the evaluator." The 1995 and 1996 performance evaluations in which Hottenroth was rated acceptable were completed by Styve. The 1997 evaluation was completed by Terrence Dempsey, who had very little input in Hottenroth's training and only observed her for one month out of the past twelve. Dempsey states that he could only classify her performance as "Acceptable" and that the score of "Above Average" that appears on the numerical portion of the evaluation was based solely on Hottenroth's evaluation of herself and her description of how well she was able to perform her assigned tasks during a conversation Dempsey had with her that day.

Lange, along with Hottenroth's supervisor Amsler, also shared responsibility for her progression through the apprenticeship program. In accordance with that responsibility, Lange drafted a letter on November 5, 1999 to the Wisconsin Bureau of Apprentice Standards stating Hottenroth had completed the 7,720 hours of work experience required under the apprentice indenture agreement. However, the letter went on to state that because other areas of the contract had yet to be fulfilled, and her proficiency had yet to be demonstrated on all the required tasks, Hottenroth was not eligible to receive her journeyman's card at that time.[5]

In late 1999, Hottenroth began voicing concerns about the work environment of the Village utility crew to Lange. On December 2, 1999 and December 9, 1999 Hottenroth approached Lange to complain about her foreman, Marv Amsler. According to Lange's handwritten notes of the meetings, Hottenroth alleged that Amsler did not explain job assignments as clearly as she would like, that she had trouble understanding him and that when she failed to perform up to Amsler's standards he would get upset. Lange's notes also suggest Hottenroth was uncomfortable with some of Amsler's language, *i.e.*, she did not like it when he told her to get her "ass" back here.

---

[5] The process prescribed in the apprenticeship contract for becoming a certified journeyman-lineman is long and involved. As stated above, 7,720 hours of work experience must be successfully completed, along with 640 hours of classroom and laboratory instruction. However, completing the required hour commitments alone does not qualify one for their journeyman's card. The record suggests that each municipality is assigned a representative whose responsibility it is to certify that the candidate has both completed the necessary hours and is proficient in all the tasks required by the contract. *See* Robatowski Dep. at 380. Indeed, Barbara Robakowski from the Wisconsin Bureau of Apprenticeship testified that "in order to get a journeyman's card, you can't just put in the hours and get the card . . . . You have to be *well qualified* and able to do *all the tasks on the contract*." *Id.* (emphasis added).

Responding to these concerns, Lange held a meeting shortly thereafter with Amsler and advised him that a number of customers, as well as fellow employees, were complaining about his "way of expression." According to Lange's testimony, Amsler, in response, made Lange aware that Hottenroth could be very obstinate at times. Amsler claimed Hottenroth made a unilateral decision not to attend the job planning sessions, despite his directions to do so. Nevertheless, Lange instructed him to make sure his employees understand their respective job assignments and directed that he hold regular meetings to discuss the assignments, making sure everyone, including Hottenroth, was present. Lange also advised Amsler that he needed to be "kinder and gentler" to his co-workers.

Despite Lange's attempts to remedy the problems between Hottenroth and Amsler, the complaints continued. On March 2, 2000, Hottenroth once again complained to Lange about Amsler's management style claiming Amsler had become angry when Hottenroth could not understand his hand signals at a job site.[6]

Lange followed up with Amsler, and was advised that Hottenroth was incapable of operating a loader (which was being used to load wood chips on a truck) in an efficient

---

[6] On the same date Lange expressed concern over the request for vacation time Hottenroth had made that same morning, which did not allow enough time for proper notice. Lange testified that Hottenroth had given less than 24 hours notice over the telephone of her intention to take four days of vacation in a row. Lange stated that it was Slinger's policy to require at least 24 hours notice, in writing, for an employee to take vacation or personal time and "a lot more" for extended vacation. Lange testified that her intention was not to discipline Hottenroth, but to find out if she was having problems with her co-workers. It appears, from the record, that this is when Hottenroth relayed her experience with Amsler earlier that day.

manner on a job that needed to be done quickly and that her demonstrated lack of proficiency was the reason he became angry with her.

In the Spring of 2000, Lange had reason to begin doubting Hottenroth's capabilities and readiness under the indenture contract to become a certified journeyman, despite the fact that she had completed her hour requirements in both on-the-job and related classroom training.[7] Two incidents in particular caused Lange concern about Hottenroth's inability to troubleshoot and her lack of confidence and aptitude when working with live electricity. Lange testified that, on one occasion, Hottenroth was unable to complete an overhead electric assignment which involved working with live electricity at the top of a pole located in the rear of the Slinger Village Hall building. Lange stated that during that incident Hottenroth was approximately thirty feet in the air when she began shaking and stated that she could not complete the assignment; and requested that she be rescued. Lange testified that the details of the second incident were very similar to the first, with Hottenroth being unable to complete an overhead electrical task because she appeared to be not only hesitant but also frightened.

Pursuant to her opinion that Hottenroth needed more training and experience to develop the necessary degree of confidence when dealing with overhead electrical work, and to help Hottenroth with her troubleshooting and her overhead skills (especially when working with live electrical lines), Lange arranged for Hottenroth to work for the City of Cedarburg, Wisconsin on the electric utility crew. Hottenroth subsequently worked with the Cedarburg electric crew for

---

[7] As mentioned above, Hottenroth completed her on-the-job hours requirement under the indenture agreement in November of 1999. In June of 2000, she completed her supplemental classroom training requirement of 640 hours under the indenture agreement.

approximately two weeks in the spring of 2000. When asked to evaluate Hottenroth's performance during that time, Steven Bell, her supervisor in Cedarburg, stated that she had trouble completing fairly simple tasks. Bell also stated that he was present on a Cedarburg job site where Hottenroth had to be rescued after she had climbed a pole and, after becoming unable to move, a bucket truck with an attached lift had to be brought on site to retrieve her. Overall, Bell compared her abilities to that of a second-year apprentice, when in fact she was in her fourth year of the program. Bell also testified that if Hottenroth was his employee he would not have felt comfortable recommending that she be certified as a journeyman. However, his observations concerning Hottenroth's lack of ability were not immediately relayed to Lange, who got the impression from Hottenroth alone that the two-week assignment with Bell was a "positive" one, when in fact it was not.

Nonetheless, on June 23, 2000, Lange spoke with Barbara Robakowski,[8] from the Wisonsin Bureau of Apprenticeship Standards regarding Hottenroth's problems sufficiently completing the requirements under the indenture agreement. Lange stated candidly that she had "reservations" as to Hottenroth's competency in troubleshooting and working overhead with live electricity.

Approximately two weeks later, on July 5, 2000, Lange and Robatowski held a meeting with Hottenroth to discuss her status under the apprenticeship agreement. Robatowski and Lange both testified that, during the meeting, Hottenroth admitted that she was indeed uncomfortable working with live electricity at heights. At that point, because her indenture period had lapsed and she was not going to receive her journeyman's card, Slinger had the option of firing Hottenroth.

---

[8] There is conflicting evidence in the record as to who telephoned whom, however, the other material facts regarding the meeting are not in dispute.

However, after considering the matter further, Lange decided to grant Hottenroth an extension of the indenture agreement for a period of one year[9] and also stated that she would do her best to secure more schooling and training for Hottenroth, trusting that she might become proficient and ultimately gain certification.

Following Lange's gratuitous decision to extend the indenture period, she went about attempting to find additional training opportunities for Hottenroth, but in the end met without success. Lange went above and beyond the call of duty and proceeded to contact some 30 other municipalities inquiring as to whether they would agree to take Hottenroth on board for a period of time; and each one of them refused. One of the people Lange contacted was Steve Bell, Hottenroth's prior supervisor in Cedarburg, who declined to invite her back.[10] However, Lange, in a further attempt to assist Hottenroth in gaining the experience and necessary skills to obtain her journeyman's card, went so far as to purchase an electric pole from another municipality and have it placed in the ground at the rear of the Slinger Village Hall in order that Hottenroth might practice working at

---

[9] Robatowski stated in deposition testimony that, according to the Wisconsin Department of Workforce Development, the apprenticeship goes "unassigned," or is extended, for a period of up to one year following the expiration of the normal four-year indenture to allow a candidate to receive additional training. Robatowski added that the decision to issue an unassignment is one that can be unilaterally made by an employer if they have concerns as to a candidate's competency.

[10] Lange testified that she even offered to pay Hottenroth's salary while she worked in the City of Cedarburg, but Bell still would not take her back. Hottenroth claims Cedarburg's decision not to invite her back for another training period was due to her filing an action with the Wisconsin Equal Rights Division on October 19, 2000, alleging discrimination and hostile work environment. *See infra* p. 10.

heights of 30-40 feet above the ground. In addition, Lange contacted the Milwaukee Area Technical College to ascertain whether there were any classes Hottenroth would be eligible to enroll in, but was advised that Hottenroth had previously completed one of the classes being offered and the others she inquired about were unavailable at that time. Thus, according to Lange's testimony, she made a number of efforts to assist Hottenroth by providing her with learning experiences, but was unable to do so. However, in contrast, the evidence in the record suggests that Hottenroth herself failed to take advantage of the learning opportunities provided to her by Slinger. During the extension of her apprenticeship period, Hottenroth frequently failed to report to work and was allegedly absent from work whenever a "live wire" project was scheduled, which would have offered her a genuine opportunity to gain confidence and improve her skills.[11]

On October 19, 2000, Hottenroth filed the first of three actions with the State of Wisconsin, Department of Workforce

---

[11] In a letter dated April 2, 2001, Lange wrote to the Bureau of Apprenticeship Standards in response to an investigation which had been initiated by the Bureau in March of 2001 against Slinger (on behalf of Hottenroth). *See* Letter from Lange to Robatowski, April 2, 2001. In the letter, Lange outlines her attempts to find suitable training opportunities for Hottenroth and her lack of success therein. *Id.* Lange goes on to describe how, in lieu of training, Slinger "set up jobs that we believe[d] [Hottenroth] had difficulties doing," so that Hottenroth might gain some proficiency and obtain the skills required for her to be granted a journeyman's card. *Id.* However, Lange states that those "opportunities were few and far between and usually ended with Ms. Hottenroth leaving the job site and going home sick or the crew bickering with each other." *Id.* The letter goes on to describe in more detail Hottenroth's frequent absenteeism and Slinger's initial intention to cancel the apprenticeship extension. However, after consulting an attorney, Slinger decided to continue the extension of Hottenroth's training and exposure to available opportunities so that she could prove her competency for a license as agreed.

Development, Equal Rights Division ("Wisconsin DWD"), and the Equal Employment Opportunity Commission ("EEOC"). This first complaint alleged that Hottenroth had been subjected to a hostile work environment and had been denied training opportunities on the basis of her sex.[12]

Beginning in February of 2001, Hottenroth's behavior became more erratic and insubordinate. The record establishes that on the morning of February 12, Hottenroth entered the administrative offices of the Village without permission and began rummaging through documents lying on the desks of various staff members, including that of the payroll clerk. Hottenroth located an employee request form for time off with her name on it and proceeded to inscribe upon it: "Stop Lying about Me!" The form shows that Hottenroth had been denied the time off due to the fact that her request had been received January 17, 2001; a day after she had actually taken off. Later that same day, Hottenroth complained of a stomach ache and asked Lange if it was all right if she went home. Lange told her she could, but later found out that on that very day Hottenroth had walked off a job site after refusing to work. When Lange was fully apprised of the situation, and after talking with Hottenroth, she suspended her from work for a period of three days and her access to the Slinger Village Hall was restricted due to Hottenroth's inappropriate behavior.

Subsequent to Hottenroth's suspension (February 26 to March 1, 2001), Lange requested a meeting with Hottenroth. At that meeting, on March 1, 2001, the two discussed the status of Hottenroth's apprenticeship and the continuation of her employment with Slinger. Lange informed Hottenroth

---

[12] It should be noted that this complaint was eventually settled by the parties and is not included in the subject matter of this appeal, but is mentioned to complete the factual background of the case.

that, despite her numerous good-faith attempts, she had been unsuccessful in procuring additional work opportunities or classroom training for her. Lange stated:

> I am totally out of luck as far as placing you in another municipality. I am totally out of luck at encouraging the [Slinger] board to do anything with you at this point. The-the Board-with you filing the-the thing or whatever, they have looked at it as a slap in the face. So, from our standpoint about getting you out and training you in whatever else, the only luck you will have is what presents itself in the Village.

Tr. of March 1, 2001 meeting between Hottenroth and Lange, pp. 29-30. In addition, Lange told Hottenroth that if she did not become a certified lineman by July 10, 2001, the expiration date of her extended apprenticeship period, she would be discharged as of that date. Lange went on to state that, as of the present date (March 1, 2001), she was still not comfortable recommending Hottenroth for her journeyman's card; however, she went on to explain that if Hottenroth was able to obtain her certification from the Bureau of Apprentice Standards (certification agency) she would be retained as an employee.

During the same meeting, Lange also discussed the possibility of a new position being created for Hottenroth. Relevant excerpts of the conversation were transcribed as follows:

> Hottenroth: But if I don't get my card by July 10 of 2001, I can't work here because I don't have a card. Right? That's right? Yes?
>
> Lange: Yes. (Inaudible) Un-unfortunately, what I was going to—well, thinking of doing—is—there was some talk of hiring new (inaudible). . . . And I could have created—possible created a position of laborer in the Westwood Facility. You would be considered a laborer. But, there is no opportu-

Lange:        nity now. They—the Personnel Committee and the Board won't listen to that. So, there would have been a possibility to claim you under a different classification.

Hottenroth:    If what? You said at one time there would have been if what—what?

Lange:        (Inaudible) If you—if you didn't file— .

Hottenroth:    With the EEOC?

Lange:        Yeah. Yeah. They're not even going to consider—and they don't—technically, they don't have to. They don't have to create a position. The position was such that you would get your license. So it's possible that you would get your license, but you'd be able to bypass them at the apprenticeship school. And my (inaudible) the apprenticeship school is to have you evaluated. I wanted them to do that, you know, in—in the first place. You know? And I was looking for opportunities. I called the apprenticeship school. I called the technical schools. I said, we'd pay to have you evaluated, to find out where you were (inaudible). . . .

Tr. of March 1, 2001 meeting between Hottenroth and Lange, pp. 31-33. When questioned about this exchange, Lange made it clear that she was not speaking on behalf of Slinger's Board because, in fact, she had never discussed this matter with the Board.

Four days after the meeting, on March 5, 2001, Hottenroth filed a second action with the Wisconsin DWD, this time basing her complaint on "sex discrimination/retaliation." Hottenroth Compl., DWD Case #2001100740; EEOC Case No. 26GA10744. Attached to the complaint, are two exhi-

bits. *Id.* Both are handwritten recitations, by Hottenroth, of incidents during which she alleged that she had been retaliated against for filing the first DWD/EEOC complaint on October 19, 2000. *Id.* In the written description of the first incident, Hottenroth outlines an alleged conversation between Lange and herself where "[Lange] said a co-worker is mad Because [sic] I filed with EEOC." *Id.* In the second exhibit, Hottenroth loosely describes pertinent parts of the conversation Lange had with Hottenroth on March 1, 2001.[13] *Id.* The DWD determined that "no probable cause existed" to establish any discrimination had occurred. On July 17, 2001, the EEOC issued Hottenroth a "Notice of Right to Sue" letter on the complaint.

During the months of March, April and May of 2001 Lange continued in her attempt to provide Hottenroth with further educational and training opportunities, but was again unsuccessful. Lange and the utility attempted to schedule Hottenroth on jobs which would help her gain proficiency in the skills she needed to qualify for her journeyman's card. However, Hottenroth proved to be her own worst enemy in that she would leave worksites before completing the required tasks or would absent herself from work altogether. According to Slinger, as of April 7, 2001 "Hottenroth had worked roughly 7 days since January 1st [2001] due to vacation time and unscheduled sick leave making it difficult to schedule or expose her to additional [learning] opportunities." Letter from Lange to Robatowski, April 2, 2001. However,

---

[13] In a parenthetical at the top of the second exhibit, Hottenroth states "since my filing I have been written up several times [sic] suspended for 3 days on Feb. 26, 27 [sic] 28. And I have developed a stomach condition . . . Mrs. Lange has said over and over I should be fired but, she won't she'll give me one more chance." DWD Case #200100740. However, she failed to describe why she was suspended, what gave her the stomach condition, or why Lange said she should be fired.

the evidence in the record suggests that Lange and Slinger had every intention of allowing Hottenroth to continue her employment at least through the end of the extension period (and perhaps longer if she gained her journeyman's card).

Nonetheless, despite the clear intention of Lange and her superiors in Slinger's administration (evinced by their statements and course of conduct), to continue the extension of the apprenticeship through July 10, 2001 as agreed, the situation came to a climax on May 23, 2001. That morning Lange had scheduled a meeting with Hottenroth and Village Administrator Gregory Knowles to discuss a number of the problems Hottenroth was having, such as: causing damage to a dump truck she was using; leaving a job site approximately a week earlier; and also refusing to perform an assignment just two days earlier. An audio recording of the meeting bears witness to the fact that about two minutes into the discussion Hottenroth became extremely upset and angry. Indeed, she became so agitated that she can be heard on the taped recording screaming at Lange and Knowles at the top of her lungs. During the tirade Hottenroth repeatedly accused Amsler and other co-workers of lying about her and on numerous (12 or more) occasions and demanded that Lange and/or Knowles terminate her on the spot. During Lange and Knowles' attempts to calm Hottenroth's outbursts and irrational behavior, their statements are repeatedly drowned out by Hottenroth's threats of litigation and repeated demands of "Fire Me! [screamed]." *Id.* at 8-10. After approximately an hour of screaming from Hottenroth, Knowles notes aloud that Hottenroth is not listening and terminates the meeting citing prior obligations.

Following the meeting, Hottenroth returned to the job site she was assigned to that day. However, when a co-worker stopped by to pick her up for lunch, she refused to leave the site and told him that she was going to work through the lunch hour. When Lange was notified of the situation she

went out to the job site and requested that Hottenroth leave. When Hottenroth again refused, Lange suspended her for the day for her insubordination and failure to follow instructions. When continued warnings from Lange to Hottenroth that she needed to leave the job site immediately because she had been suspended were ignored, Lange called the Slinger police. Officer Dean Schmidt arrived on the scene and, after talking with Lange, was advised that she (Lange) was willing to give Hottenroth another chance to leave on her own. However, Officer Schmidt was told that if Hottenroth refused to leave the site on her own, he should remove her.

As Schmidt approached Hottenroth, her obstinance continued. Lange again asked her, on two separate occasions, to leave the job site and report to the Village Hall, but each time Hottenroth refused and responded: "You need to fire me." Slinger Police Dept. Compl. No. 2001-00787-A (May 23, 2001). Because Hottenroth appeared "very agitated" and was holding in her hand what appeared to Officer Schmidt to be a box cutter knife, he called for back-up. However, after further talking and coercion from Officer Schmidt, Hottenroth placed her tools (including the box cutter) down and began to gather her personal items. Hottenroth then left the site in the back of Officer Schmidt's squad car without further incident. *Id.*

Once back at City Hall, Lange told Hottenroth to gather her belongings and leave for the day. Hottenroth again became enraged stating "you need to fire me" and "I'm going to sue . . . . I'm going to sue." *Id.* Officer Schmidt then escorted Hottenroth out of the building and observed as she proceeded to throw a radio to the ground, pick it up and then propel it in the direction of Officer Schmidt after he requested that she hand it to him. Officer Schmidt next observed her enter her truck and leave the parking lot.

The following day, May 24, 2001, after reviewing the details of the incident and the record of the previous day's

meeting, Village Administrator Knowles met with Hottenroth. During the meeting he advised her that she would be suspended with pay through May 29, 2001. Knowles testified that the decision to suspend Hottenroth was his alone. On May 29, 2001, Knowles terminated Hottenroth and, in support of his termination decision, cited a number of work rule infractions from the Slinger Village Personnel Manual, which are implemented under Article III, Section B of Hottenroth's collective bargaining agreement. Specifically, Knowles states that Hottenroth violated provisions of her contract which "may result in disciplinary action, up to and including discharge" such as the following: "(a) Incompetence or failure to perform duties; (e) Intentional, careless or negligent damage to public or private property, during the performance of your duties. Failure to report damage to public or private property during the performance of duties; (f) Offensive conduct or language toward the public, Village officers, or employees while on duty; (g) Insubordination; and (h) Violation of personnel policies, work rules, or safety procedures." Again, Knowles testified that he alone decided to terminate Hottenroth while Lange had, on the other hand, urged restraint.

Hottenroth filed her third and final discrimination claim with the DWD and the EEOC on June 13, 2001. DWD Compl. No. 200101880. In that complaint, Hottenroth identifies the basis of her complaint as "SEX (female) RETALIATION (filed a complaint)." In an attachment to the complaint Hottenroth outlines, in her own words, the events of May 23 and 24th surrounding her termination, and includes a final paragraph which reads:

> Mr. Amsler and Mr. Fitzgerald have violated work rules, and safety rules, [sic] where at several times offensive in conduct and language towards me, carelessness and negligence of property, failure to perform duties, as I brought to Mrs. Lange's attention she has failed to discipline or discharge them. I believe the Respondent has

> treated me differently from them because of my sex and because of the previous discrimination complaints I filed.

*Id.* In the complaint, Hottenroth also recounts what she characterizes as the "lies" and "horrible treatment" she suffered through, as well as alleged misdeeds by her co-workers that went unpunished. The DWD, after review, again found that there was no probable case to suggest discrimination had occurred and the EEOC again issued a right to sue letter.

The Wisconsin Bureau of Apprenticeship Standards held a hearing on October 15, 16, and 23, 2001, pursuant to a complaint Hottenroth filed in June of 2000, regarding the extension of her apprenticeship indenture period and a counter-request by Slinger to cancel the agreement altogether. In a written opinion issued April 5, 2002, Hearing Officer Vidal Rodriguez concluded, in part, that "[t]he Village of Slinger Municipal Electric Utility did not meet its burden of demonstrating that Ms. Hottenroth failed to progress satisfactorily with on the job work experience." Hottenroth Brief, Appendix Exh. D. at pg. 52. Hearing Officer Rodriguez then denied Slinger's request to cancel the indenture and ordered that the agreement be fully enforced. *Id.* However, in a letter dated April 5, 2002 the Bureau of Apprenticeship Standards notified Hottenroth that Rodriguez refused her requests to be certified as competent and thus refused to issue her a journeyman's card. The same letter informed Hottenroth that she had been granted an independent evaluation, after the successful completion of which, she would be given her certification. The record establishes that Hottenroth never made an attempt to take advantage of this offer and thus, to this day has not received her certification.

Hottenroth responded to the Bureau of Apprenticeship Standards' decision refusing to certify her by instituting a mandamus action on October 31, 2002 in the Dade County

Wisconsin Circuit Court, seeking the issuance of her license. On January 29, 2003, the Honorable David Flanagan granted the Bureau of Apprenticeship Standards' motion to quash the writ.

Hottenroth also filed two separate actions in the District Court for the Eastern District of Wisconsin alleging various Title VII and pendant state law contract claims. *See Hottenroth v. Village of Slinger*, Case No. 01-C-1048; *Hottenroth v. Village of Slinger*, Case No. 2-C-207. The district court, Judge Randa presiding, consolidated the two actions alleging discrimination in her employment and retaliation, in violation of 42 U.S.C. § 2000e *et seq.*; as well as her state law breach of contract claims. Slinger moved, in each of the two consolidated cases, for summary judgment for failure to state a claim upon which relief could be granted; and Hottenroth cross-motioned for partial summary judgment on her retaliation and breach of contract claims. The district court, in a written opinion, denied Hottenroth's motion. However, the court granted Slinger's motion for summary judgment and dismissed Hottenroth's Title VII claims in both actions and declined to exercise pendent jurisdiction over her state law claims. Affirmed.

## II. ANALYSIS

We review the district court's grant of summary judgment in favor of Slinger *de novo. See Stark v. PPM America, Inc.*, 354 F.3d 666, 670 (7th Cir. 2004). In order to determine whether summary judgment is proper at this stage in the proceedings we view the record in the light most favorable to the non-moving party, Hottenroth. *See Dunn v. Nordstrom, Inc.*, 260 F.3d 778, 783 (7th Cir. 2001). Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact

presents a "genuine issue" if it is "one on which a reasonable factfinder could find for the nonmoving party." *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997). An issue of fact is "material" if it is outcome determinative. *Id.* However, "bare allegations not supported by specific facts are not sufficient in opposing a motion for summary judgment." *Hildebrandt v. Ill. Dept. of Natural Res.s*, 347 F.3d 1014, 1036 (7th Cir. 2003). In addition, there can be no "genuine issue as to any material fact" when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1996). This is because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

## A. Hottenroth's Retaliation Claim

Within the meaning of Title VII, "unlawful retaliation occurs when an employer takes an adverse employment action against an employee." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003); *see* 42 U.S.C. § 2000e-3. Hottenroth claims that Slinger took three separate adverse actions against her in retaliation for her multiple filings with the Wisconsin DWD and the EEOC. In particular, she claims that the refusal to "sign off" on her apprenticeship card, failure to provide the necessary training opportunities and her termination all constituted adverse actions within the meaning of Title VII. The district court disagreed and concluded that, as a matter of law, Hottenroth had failed to establish that she had been subject to an "adverse employment action." Specifically, the trial judge concluded from the record that Lange was not a decision-maker in this factual situation and therefore, any discriminatory statements allegedly made by Lange were not relevant to

Hottenroth's claim. In addition, the district court found that Lange's refusal to "sign off" on Hottenroth's journeyman's card was well within her discretion and thus could not constitute an adverse employment action. Finally, the trial court found that Lange's failure to create a new position for Hottenroth was not actionable because Hottenroth was not entitled to a have a new position created and the decision to create a new position was not Lange's to make, but was solely that of the Slinger Board. For diminutively different reasons, we agree.

In resisting summary judgment under Title VII, a plaintiff has two available methods of proving retaliation: the "direct" and "indirect method." *Rogers*, 320 F.3d at 753. Under the direct method a plaintiff must provide "direct evidence (evidence that establishes without resort to inferences from circumstantial evidence) that he [or she] engaged in protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which he complains. If the evidence is uncontradicted, the plaintiff is entitled to summary judgment." *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). In a claim involving allegations of retaliation, the direct method essentially requires direct evidence "that, if believed by the trier of fact would prove [discrimination] 'without reliance on inference or presumption.*" Rogers*, 320 F.3d at 753 (citing *Walker v. Glickman*, 241 F.3d 884, 888 (7th Cir. 2001)). Said differently, direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited amicus." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). However, it should not be surprising that in today's workplace environment such admissions are rarely, if ever, made or encountered. *See id*. Therefore, under the direct method we now also allow circumstantial evidence to be introduced which would allow "a jury to infer intentional discrimination by the decision-maker." *Rogers*, 320 F.3d at 753.

Alternatively, under the indirect method, a plaintiff must first demonstrate that subsequent to the filing of a discrimination complaint, "[s]he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though [s]he was performing [her] job in a satisfactory manner." *Stone*, 281 F.3d at 644. If such a *prima facia* case of discrimination is established, the defendant bears the burden of establishing "unrebutted evidence of a noninvidious reason for the adverse action." *Id.* This rule was developed to clarify the traditional burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and eliminates the need for a plaintiff to show a "causal-link" between a protected activity and an adverse employment action.[14] *Rogers*, 320 F.3d at 755.

However, whether a plaintiff proceeds under the direct or indirect method, evidence establishing that an adverse employment action has actually taken place is an essential element of the claim. *Id.* at 753-55. Some examples of an adverse employment action include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993). Although, "conditions of employment that are designed to harass and humiliate employees because of their [sex] are actionable employment actions," *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000), "not every-

---

[14] Hottenroth incorrectly identifies the elements necessary for proving, via the indirect method, retaliation under Title VII. Instead of utilizing the friendlier rule under *Stone*, Hottenroth attempts to proceed under the earlier "causal-link" framework embodied in this circuit's earlier Title VII decisions. *Stone*, 281 F.3d at 644.

thing that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996).

As a threshold matter, the district court failed to find any adverse action under Title VII. Hottenroth claims she was subject to, and has shown sufficient evidence of, three separate retaliatory actions and thus, this court should reverse. On appeal Hottenroth specifically claims Slinger took the following adverse employment actions in reaction to her discrimination claims: (a) refusal to "sign off" on her journeyman's card; (b) her termination; and (c) failure to provide her with adequate training. We disagree.

### 1. Refusal to Recommend Hottenroth be Given a Journeyman's Card

Hottenroth claims that Lange's refusal to recommend that she be certified as a journeyman is an adverse employment action within the meaning of Title VII because Lange's refusal was predicated on a retaliatory motive based on Hottenroth's October 2000 sex discrimination complaint with the EEOC and Wisconsin DWD. The district court disagreed and found no adverse action because: (a) the ultimate decision to certify Hottenroth was not Lange's to make, but was that of the Wisconsin DWD, Bureau of Apprentice Standards; and (b) because whether to recommend Hottenroth or not was squarely within Lange's discretion. We agree, but for slightly different reasons.

First, one element of a *prima facia* retaliatory discrimination case in this circuit is that (in order to survive summary judgment) the plaintiff must demonstrate, through some affirmative evidence, that "after lodging a complaint about discrimination . . . [the employee] was subjected to an adverse employment action." *Stone*, 281 F.3d at 642. It is not disputed that Hottenroth filed her first sex discrimination lawsuit on October 19, 2000. However, Lange initially

informed Hottenroth of her intention not to recommend Hottenroth for certification in July of 2000, *three months prior to the filing of the complaint.* In order for Lange to discriminate against Hottenroth on the basis of the October 19 complaint, she would have had to have been in possession of extrasensory powers of perception. In addition, even after the complaints were filed, Lange at no time suggested or inferred that she would never recommend Hottenroth for certification. Instead, Lange urged and even offered to help Hottenroth seek an outside evaluation to prove she was competent. Indeed, Lange went out of her way to assist Hottenroth by contacting other municipalities, schools, and other agencies to attempt to procure additional training, *i.e.*, learning experiences, in order that Hottenroth might gain proficiency in ascending and descending electric poles while working with live electricity. In fact, Lange went above and beyond her responsibility to Hottenroth by purchasing an electric pole from another municipality so that Hottenroth might practice and become proficient.

Also, it is well established that unfulfilled threats that result in no material harm cannot be considered an adverse employment action under Title VII. *See Ajayi v. Aramark Bus. Serv.s*, Inc., 336 F.3d 520, 531 (7th Cir. 2003) (citing *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002)). Hottenroth has failed to present any evidence that might allow a reasonable person to infer that Lange unequivocally refused to recommend Hottenroth be certified, much less that such a decision was motivated by a discriminatory or retaliatory amicus. As referred to above, up until the final days of Hottenroth's employment (when she acted in an erratic and out-of-control manner), Lange's recorded conversations with Hottenroth and transcripts thereof establish the fact that Lange continued to attempt to assist Hottenroth in any way she could. Indeed, Lange went far beyond the call of duty and told Hottenroth that she would assist her in being evaluated by a third party (*i.e.*, outside Slinger) to determine whether she was competent to receive her license.

In the end, however, Lange never had an opportunity to make a final decision about Hottenroth's competency because Hottenroth was terminated by the Village Administrator Gregory Knowles, for violations of the Slinger personal manual as well as breaches of Hottenroth's collective bargaining agreement, before the end of her extended indenture period. *See infra* p. 15-16.

Finally, we agree with the trial judge's holding that Lange's refusal to recommend Hottenroth for certification as a journeyman-lineman, based on a belief that Hottenroth was not qualified due to her poor job performance and out-of-control behavior, was properly within Lange's discretion, and thus did not constitute an adverse employment action. As the trial court pointed out, we have repeatedly held that "even the denial of a monetary perk, such as a bonus or reimbursement of certain expenses, does not constitute an adverse employment action if it is wholly within the employer's discretion to grant or deny and is not a component of the employee's salary." *Tyler v. Ispat Inland, Inc.*, 245 F.3d 969, 972 (7th Cir. 2001) (citing *Rabinovitz v. Pena*, 89 F.3d 482, 488-489 (7th Cir. 1996) and *Fyfe v. City of Fort Wayne, Ind.*, 241 F.3d 597, 602-03 (7th Cir. 2001)). Lange's refusal to make a recommendation was clearly within her discretion as Hottenroth's supervisor. Indeed, Lange would have been derelict in her duty to serve the best interests and protect the safety of Hottenroth and Slinger's employees, as well as the general population of the Village of Slinger, if she had recommended that an unqualified candidate such as Hottenroth receive a journeyman's card. Also, the decision not to recommend Hottenroth did not effect her salary and cannot be considered an entitlement. This is because Hottenroth never had an entitlement to her journeyman's card, let alone a positive recommendation from Lange. *Tyler*, 245 F.3d at 973. Instead, Hottenroth was required to demonstrate proficiency in the required areas, as mandated by Chapter 106 of the Wisconsin Statutes, in order to

become certified by the State of Wisconsin as a journeyman-lineman, which she failed to do. *See* Wis. Stat. § 106.01 *et. seq.* Based upon this record we refuse to conclude that the denial of a completely discretionary, merit-based recommendation constitutes an adverse employment action. In the end, it appears that Hottenroth was nothing more than a troubled, malcontent employee who took out her frustrations over her lack of ability, confidence or talent on her employer, the Village of Slinger, by filing three separate discrimination complaints (as well as this lawsuit). In addition, the evidence makes clear that Lange's decision not to recommend Hottenroth for a journeyman's card, in addition to being well within her discretion, was not only predicated on Hottenroth's personal safety, but was also based on a concern for the safety, welfare and protection of the public at large.

### 2.   Hottenroth's Termination

Hottenroth next claims that because the Village allegedly retaliated against her for filing a discrimination claim, which she alleges prevented her from gaining her journeyman's certification, she was terminated and therefore subjected to "the most adverse an employment action [that] [sic] can be in the context of a discrimination case." (App. Br. at 27). In the alternative, Hottenroth argues that her ultimate termination was the result of the Lange's retaliatory refusal to create a new position for her. The district court found that, because Village Administrator Knowles was the decision-maker who decided to discharge Hottenroth and because Lange was not involved in the final decision; Hoettenroth's termination did not constitute an adverse employment action in this context.[15] In addition, the trial judge found

---

[15] Judge Randa stated: "Hottenroth argues that her discharge was retaliatory. Hottenroth cites the conversation she had with Lange

(continued...)

that Hottenroth was not entitled to have a new position created for her because it was up to Slinger's Board, the entity vested with the authority to create such a position, to make any employment decision of this kind or nature. Thus, any alleged discriminatory statements made by Lange were irrelevant. We agree with the district court's decision, but for slightly different reasons.

Because we hold that Lange's failure to recommend that Hottenroth receive her journeyman's card based on her lack of proficiency and/or competency in the required areas was not an adverse employment action within the meaning of Title VII, any claim that Hottenroth was terminated due to her lack of certification, cannot, by extension, be considered an adverse action either.[16] In addition, the evidence pre-

---

[15] (...continued)
in March of 2001, during which Lange speculated that she could not 'sell' a new position for her to the Village Board in the event she [Hottenroth] did not receive her journeyman-lineman card because the Board would likely react negatively to her EEOC filing . . . [I]t is undisputed that Knowles was the decisionmaker responsible for firing Hottenroth, not Lange. Such comments made by those outside the decisionmaking chain are not relevant for purposes of a valid discrimination claim." *Hottenroth v. Slinger*, Nos. 01-CV-1048 and 02-CV-207 (March 31, 2003).

[16] Because we find that Hottenroth's termination, in this context, was not an adverse action, we need not consider the other elements of the direct or indirect method of proving retaliation. *See Stone*, 281 F.3d at 644. The district court decided that Village Administrator Knowles, as decisionmaker, could not have retaliated against Hottenroth. Under the direct method Hottenroth must produce direct evidence that the "decisionmaker has acted for a prohibited reason," which Hottenroth has not. *Rogers*, 320 F.3d at 754. In her brief Hottenroth blames Lange and, through statements related by Lange, the Slinger Board for retaliation, but she offers no evidence (either direct or indirect) that Village
(continued...)

sented establishes that Lange made a more than valiant effort to train and keep Hottenroth employed until the very day that Village Administrator Knowles terminated her for insubordination. On numerous occasions Lange advised and encouraged Hottenroth by stating that if she were to gain her journeyman's card she would be able to continue in her employment with Slinger. Most importantly, Knowles (not Lange's) decision to terminate Hottenroth was based on a pattern of insubordination, absences, attitude, and not because she failed to receive her certification. Hottenroth herself testified that she was not terminated for her lack of a journeyman's card, but because she refused to follow orders and had a bad attitude towards her superiors.[17]

---

[16] (...continued)

Administrator Knowles acted in a discriminatory manner. Indeed, even under the indirect method, which requires a showing of pre-text after a *prima facia* case has been estblished, there is ample evidence in the record to establish that Knowles had numerous "noninvidious" reasons and good cause to terminate Hottenroth. *See id.* at 755. Thus, assuming *arguendo* that we were to find Hottenroth's termination to be an adverse action, summary judgment would still have been proper. *Id.*

[17] When questioned about the reason why she was terminated, Hottenroth responded as follows:

Q:    Do you know the reasons why you were terminated?

A:    Because I worked through lunch.

Q:    I'm sorry?

A:    Because I worked through lunch.

Q:    So you were terminated because you worked through lunch?

A:    An [sic] didn't obey the command to go home, so I was suspended.

Q:    Are you aware of any other reason why you were terminated?

(continued...)

Therefore, in this context, Hottenroth's termination was not an adverse employment action, but was based on good cause. *See Newbold v. Wisconsin State Pub. Defender*, 310 F.3d 1013, 1017 (7th Cir. 2002).

However, even if we were to hold that Hottenroth's termination was an adverse employment action in this context, Slinger would still be entitled to summary judgment because Hottenroth has not established even an attenuated link between any alleged retaliation or discrimination and her termination. *See Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001); *see also Markel v. Bd. of Regents of the Univ. Of Wis. Sys.*, 276 F.3d 906, 910 (7th Cir. 2002).

### 3.   Slinger's Failure to Create A New Position

Also, the failure of the Slinger Board to create a new position for Hottenroth cannot, as a matter of law, be considered an adverse action. As mentioned above unfulfilled threats (such as Lange's presumption that the board would not look favorably on Hottenroth having filed an EEOC com-

---

[17] (...continued)

> A:     Because I got angry maybe at the meeting.
>
> Q:     Are you aware of any other reason why you were terminated?
>
> A:     Things that they said about me possibly.
>
> Q:     What things that they said about you?
>
> A:     They said I wasn't working, they said that I wrecked the springs and seals on the dump truck, they said that I swore, that I refused to do jobs.
>
> Q:     Do you know of any other reasons you were terminated?
>
> A:     No.

Hottenroth Dep. at 133-34.

plaint) resulting in no material harm falls far short of constituting an adverse employment action. *See Ajayi*, 336 F.3d at 531. Hottenroth claims that statements made by Lange suggest that the Slinger Board was not going to create a new position for her because they were angry with her for filing a discrimination complaint. Among other things, Lange stated that, because Hottenroth had "gone against her employer," she would have a hard time getting them to go along with the suggestion that they create a new position for Hottenroth. Although her comments may not have been an exercise of the best judgment when considering she was dealing with an insubordinate, malcontent and belligerent employee, Lange testified that she had not, at any time, discussed the creation of a new position with the Slinger Board and there is absolutely no evidence in the record to otherwise suggest that the Slinger Board was ever approached with such a proposal. Thus, Lange's perception that the Board would be adverse to such a suggestion was just that, her perception. The Slinger Board never had such a proposal before it and thus, had no opportunity to even consider it, much less take a prohibited adverse action against Hottenroth.

It should be emphasized once again that an adverse employment action does not include an employer's refusal to grant an employee a discretionary benefit to which she is not automatically entitled, *see Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996), and Hottenroth has failed to offer any evidence to prove beyond a preponderance of the evidence or even to suggest that she was ever entitled to have a new position created for her. In addition, because Lange was never vested with the authority to create a new position for Hottenroth, her failure to do so (even, assuming *arguendo* that Hottenroth was entitled) could not be considered an adverse employment action because the Village Board *only*, and not Lange, was the ultimate decision-maker. *See Rogers*, 320 F.3d at 754 (in order for there to be a cog-

nizable adverse employment action evidence must be presented that suggests the "decisionmaker has acted for a prohibited reason").

It remains undisputed that, at no point, was Hottenroth entitled to a new position with the Village of Slinger. *See Tyler*, 245 F.3d at 973. Hottenroth may have been disappointed when she was informed that Lange was not going to urge the Board to create a new job for her, but "not everything that makes an employee unhappy is an actionable adverse action." *Smart*, 89 F.3d at 441.

### 4. Failure to Adequately Train Hottenroth

Finally, Hottenroth claims Slinger inappropriately retaliated against her, based on the filing of her EEOC discrimination complaint, by failing to adequately train her. Specifically, Hottenroth claims Lange retaliated against her because she "failed completely to find any kind of training and work experience opportunities for Hottenroth." Even if we were to assume that this argument was supported by any evidence in the record, the district court was never presented with this argument in the context of her Title VII action and, thus, we hold this claim is not properly before us and has been waived on appeal. *See United States v. Shorty*, 159 F.3d 312, 313 (7th Cir. 1998) ("failure to raise an issue before the district court results in waiver of that issue on appeal").

However, assuming *arguendo* that the issue has not been waived, Hottenroth has failed to establish that the denial of training opportunities to her constituted an adverse employment action or that she was denied adequate training at all. Evidence supplied to the trial court suggests that after the extension of Hottenroth's apprenticeship period (and the filing of the complaints) Lange repeatedly attempted, in good faith, to secure additional work and educational opportunities in the surrounding area, for Hottenroth to

gain competency and confidence. This is evinced by the fact that Lange went so far as to specifically purchase and have an electric pole installed for climbing and descending practice in the rear of the Slinger Village Hall and, in addition, contacted a number of schools and municipalities on Hottenroth's behalf. In addition, Hottenroth has failed to offer any evidence whatsoever to refute contrary evidence establishing that Lange attempted to place Hottenroth (at least temporarily) with over 30 different municipalities and called on a number of educational facilities, to no avail.[18] Indeed, even the City of Cedarburg, Wisconsin (which had previously granted Hottenroth the opportunity to train with them) refused to employ her a second time for reasons which were made quite clear by her former supervisor in Cedarburg, Steve Bell, *i.e.*, that Hottenroth failed to perform at an acceptable level of proficiency. Therefore, failure on the part of Lange to do almost the impossible and find additional training opportunities for Hottenroth, despite a good-faith

---

[18] Hottenroth cites only the following statement by Lange to support her inadequate training argument:

> I am totally out of luck as far as placing you in another municipality. I am totally out of luck at encouraging the [Slinger] board to do anything with you at this point. The—the Board—with you filing the—the thing or whatever, they have looked at it as a slap in the face. So, from our standpoint about getting you out and training you in whatever else, the only luck you will have is what presents itself in the Village.

Transcript of March 1, 2001 meeting between Hottenroth and Lange 29-30. However, this statement would suggest the Board, as the training decisionmaker, was taking an adverse action against Hottenroth, something she does not allege. Nonetheless, as mentioned above Lange was not speaking on behalf of the Board; she made it clear that she was merely relating her own personal perception of the situation. Indeed, there is no evidence that Lange ever gave up looking for additional training opportunities for Hottenroth.

effort to do so, falls far short of constituting an adverse employment action. In this respect, Hottenroth has failed to demonstrate even an "inference of discrimination." *Patel*, 105 F.3d at 371. In essence, Lange went above and beyond what was required of her in attempting to help Hottenroth successfully complete her training and gain her journeyman's card.

Because Hottenroth has failed to demonstrate that any adverse employment action has been taken against her, we agree with the district court's decision granting the defendant-appellee Slinger's motion for summary judgment on her Title VII retaliation claim.

## B.   Hottenroth's Hostile Environment Claim

Next, Hottenroth claims the district court erred in holding that her hostile environment claims were barred for failure to exhaust administrative remedies. Hottenroth claims that the facts and circumstances described in her second and third complaints such as; "a confrontation . . . with a co-worker, the unassignment of [Hottenroth's] apprenticeship, the fear [she] had of a [sic] co-worker, and name calling by another, . . . the lack of training, the denial of plaintiff's apprenticeship card, as well as the suspension issued to [Hottenroth] in February of 2002," suggest her intention to make out a hostile environment claim. Hottenroth claims the district court impermissibly and inappropriately "stepped into her shoes," when determining whether her complaints were sufficient to serve as the basis for a hostile work environment claim. We disagree.

Under Title VII, in order for a claimant to establish a *prima facia* case alleging a hostile work environment, Hottenroth must first demonstrate that she was harassed, because of her sex, by a co-worker or supervisor. *See Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462 (7th Cir. 2002). Also, the alleged harassment must be "so severe or perva-

sive as to alter the conditions of employment and create an abusive working environment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998). In *Faragher*, the Supreme Court described a hostile workplace as "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.* at 787. Factors considered include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employees' work performance." *Id.* at 787-88. However, we do not consider these factors in a vacuum; "rather, an employee's claim must be evaluated in light of the social context in which events occurred.*" Hilt-Dyson*, 282 F.3d at 463.

A condition precedent to bringing a Title VII hostile work environment is that the employee must have "afford[ed] the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion." *Cheek v. Western & Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). To allow plaintiffs to bypass the EEOC and head straight for the courts would indeed frustrate Congress' clear and unambiguous purpose in creating the agency and deprive employers of their right to notice. *See id.* However, because EEOC complaints are most often compiled without the assistance of counsel, we afford plaintiffs considerable leeway and ask only whether a claim set forth in the complaint is "like or reasonably related to the allegations of the charge and growing out of such allegations." *Id.* (citing *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 167 (7th Cir. 1976) (en banc)).

Even considering this minimal burden, the facts and allegations set forth in Hottenroth's final two EEOC filings do not rise to the level of cognizable hostile workplace claims. In her second complaint, dated March 1, 2001, Hottenroth claims that she was yelled at, that she was upset by her co-

workers and Lange, and that she felt threatened on three separate occasions. However, these allegations fall far short of describing an environment that is so "severe or pervasive as to create an abuse working environment." *Faragher,* 524 U.S. at 786.

Hottenroth's third and final complaint suffers from similar shortcomings. Pages one through three of the appendix to Hottenroth's June 13, 2001 DWD complaint recounts the events of May 23, 2001 to May 29, 2001, such as her meeting with Knowles and Lange on May 23, her refusal to leave the job site later that day and her termination on May 29. *See infra* pp. 14-16. These recitations have no bearing whatsoever on a hostile work environment claim. However, in the final paragraph, Hottenroth states:

> Mr. Amsler and Mr. Fitzgerald have violated work rules, and safety rules, where [sic] at several times offensive in conduct and language towards me, carelessness and negligence of property, failure to perform duties, as I brought to Mrs. Lange's attention she has failed to discipline or discharge them. I believe the Respondent has treated me differently from them because of my sex and because of the previous discrimination complaints I filed.

DWD Compl. No. 200101880. Such vague and unsupported statements clearly fall far short of establishing a claim of a hostile work environment. In her complaints, Hottenroth alleges no specific evidence of anything which could reasonably be considered either objectively or subjectively hostile. *See Faragher*, 524 U.S. at 787. If this court were to hold otherwise, any complainant, who at any time filed any manner of claim with the EEOC, could collaterally attack an adverse ruling on hostile work environment grounds. *See Cheek,* 31 F.3d at 500 ("[A]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would frustrate the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the

charge"). Thus, because Hottenroth has failed to exhaust her administrative remedies as to her hostile work environment charge and because she has not otherwise established a cognizable hostile work environment claim, we affirm the decision of the district court granting summary judgment and dismissing this claim.

### C. Hottenroth's Assertion that Material Facts are in Dispute

Hottenroth claims the district judge reached factual conclusions that were not in the record or in dispute. Specifically, Hottenroth claims that evidence regarding Amsler's manner of speaking (according to Hottenroth he spoke with a drawl) was misrepresented and that facts regarding Hottenroth's two week assignment in Cedarburg were misconstrued by the trial judge. Hottenroth also claimed that facts surrounding Lange's March 1, 2001 meeting with Hottenroth, where Lange allegedly made retaliatory statements, were in dispute.

First, we reiterate the fact that we review the grant of a motion for summary judgment under Title VII *de novo*. *See Stark*, 354 F.3d at 670. Under such a standard we are free to draw our own conclusions of law and fact from the record before us. *See Beischel v. Stone Bank School Dist.*, 362 F.3d 430, 434 (7th Cir. 2004). Thus, any allegation that the trial judge misconstrued or misrepresented facts in his opinion is misplaced because, pursuant to the *de novo* standard of review we apply to a decision granting summary judgment by a trial court, we are free to substitute our own judgment for that of the district court.

In addition, viewing the record, including the meeting between Hottenroth and Lange on March 1, 2001, in the light most favorable to Hottenroth, she has failed to establish that any adverse action was taken against her in retaliation for her filing a complaint with the EEOC. *See Dunn, Inc.*, 260 F.3d at 783. As we noted above, there can be no "genuine issue as to any material fact" when a party fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Therefore, Hottenroth's final assignment of error must also fail as a matter of law.

### III.  CONCLUSION

For the reason set forth herein the judgment of the district court is

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*